**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**
**CASE # 14-123**

**DAVID CAMM**                                                                                    **PLAINTIFF**

**vs.**

**STANLEY O. FAITH,**
**IN HIS INDIVIDUAL CAPACITY**

       Serve:  Stanley O. Faith
               a/k/a Stan Faith
               412 EAST MAIN ST.
               NEW ALBANY, IN 47150-5823

**and**

**DETECTIVE SEAN CLEMONS,**
**IN HIS INDIVIDUAL CAPACI'I'Y**

       Serve:  Sean Clemons
               INDIANA STATE POLICE
               8014 OLD INDIANA 311
               SELLERSBURG, IN 47172

**and**

**SERGEANT DETECTIVE SAM SARKISIAN,**
**IN HIS INDIVIDUAL CAPACITY**

       Serve:  Sam Sarkisian
               INDIANA STATE POLICE
               8014 OLD INDIANA 311
               SELLERSBURG, IN 47172

**and**

**SERGEANT JAMES NIEMEYER,**
**IN HIS INDIVIDUAL CAPACITY**

       Serve:  James R. Niemeyer
               421 LYNNWOOD STREET
               SHOALS, IN  47581

**and**

**CAPTAIN WILLIAM L. WALLS,**
**IN HIS INDIVIDUAL CAPACITY**

      Serve:  William ("Bill") L. Walls
               53 COUNTY ROAD 350 SOUTH
               COLUMBUS, IN 47201-9589

**and**

**SERGEANT ROBERT NEAL,**
**IN HIS INDIVIDUAL CAPACITY**

      Serve:  Robert Neal
               7915 HIGH JACKSON RD
               CHARLESTOWN, IN 47111-8600

**and**

**LIEUTENANT JAMES BIDDLE,**
**IN HIS INDIVIDUAL CAPACITY**

      Serve:  James Biddle
               140 EAST EASTERN HILLS BLVD
               SALEM, IN 47167-9719

**and**

**LIEUTENANT JAMES HICKERSON,**
**IN HIS INDIVIDUAL CAPACITY**

      Serve:  James Hickerson
               DIRECTOR OF SECURITY,
               HANOVER COLLEGE
               COLLEGE AVENUE
               HANOVER, IN 47243

**and**

**MYRON WILKERSON,**
**IN HIS INDIVIDUAL CAPACITY**

      Serve:  Myron Wilkerson
               INDIANA STATE POLICE
               8014 OLD INDIANA 311
               SELLERSBURG, IN 47172

**and**

**DETECTIVE GARY GILBERT,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve: Gary Gilbert
           GAMING ENFORCEMENT INVESTIGATOR
           11999 CASINO CENTER DRIVE, S/E
           ELIZABETH, IN 47117

**and**

**INVESTIGATOR JACQUELINE VAUGHT,**
**IN HER INDIVIDUAL CAPACITY**

    Serve: Jacqueline ("Jackie") Vaught
           412 EAST MAIN STREET
           NEW ALBANY, IN 47150

**and**

**INVESTIGATOR ANTHONY TORAN,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve: Anthony ("Tony") Toran
           707 VALLEY VIEW TRACE
           NEW ALBANY, IN 47150-7401

**and**

**INVESTIGATOR MARK HENDERSON,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve: Mark Henderson
           1246 BEECHWOOD
           NEW ALBANY, IN 47150-2521
**and**

**INVESTIGATOR EMILY FESSEL MILLER,**
**IN HER INDIVIDUAL CAPACITY**

    Serve: Emily Fessel Miller
           3951 LAWRENCE BANET ROAD
           FLOYDS KNOBS, IN 47119-9607

**and**

**KEITH HENDERSON,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve:  Keith Henderson
              FLOYD COUNTY, INDIANA
              FLOYD COUNTY PROSECUTOR'S OFFICE
              311 HAUSS SQUARE, ROOM 249
              NEW ALBANY, IN 47150

**and**

**INVESTIGATOR BARRY WAYNE KESSINGER,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve:  Barry Wayne Kessinger
              11575 KESSINGER WAY
              GREENVILLE, IN 47124-9209

**and**

**STEVE OWEN,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve:  Steve L. Owen
              1347 Southview Lane
              Paoli, IN 47454-9477

**and**

**ROBERT STITES,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve:  Robert Stites
              14678 S/W PEAK COURT
              TIGARD, OREGON 97224-1279

**and**

**RODNEY ENGLERT,**
**IN HIS INDIVIDUAL CAPACITY**

    Serve:  Rodney Englert
              2461 RIVERKNOLL WAY
              WEST LINN, OREGON 97068-3625

**and**

**ENGLERT FORENSIC CONSULTANTS, LLC**

      Serve: Rodney Englert
             2461 RIVERKNOLL WAY
             WEST LINN, OREGON 97068-3625

**and**

**FLOYD COUNTY, INDIANA**

      Serve: Mark Seabrook
             County Commissioner
             CITY-COUNTY BUILDING
             311 WEST FIRST STREET
             NEW ALBANY, IN 47150

**and**

**UNKNOWN JOHN DOE AND JANE DOE OFFICERS, IN THEIR INVDIVIDUAL
CAPACITIES**

           Serve: INDIANA STATE POLICE
                  8014 OLD INDIANA 311
                  SELLERSBURG, IN 47172

**and**

**UNKNOWN RICHARD AND ROBERTA ROE SUPERVISORS,
IN THEIR INDIVIDUAL AND POLICYMAKING CAPACITIES**

           Serve: INDIANA STATE POLICE
                  8014 OLD INDIANA 311
                  SELLERSBURG, IN 47172

           Serve: Mark Seabrook
                  Floyd County Commissioner
                  City-County Building
                  311 West First Street
                  New Albany, IN 47150

<u>**VERIFIED COMPLAINT AND JURY DEMAND**</u>

      The Plaintiff, David Camm, by his undersigned counsel, Garry R. Adams, Thomas E.

Clay, Daniel J. Canon, and the law firm of CLAY DANIEL WALTON & ADAMS, PLLC, and

for his causes of action states as follows:

## INTRODUCTION

1.     Plaintiff, David Camm, is a resident of the state of Indiana and a former Indiana State police officer. As set forth below, Defendants framed him for the murder of his wife and two children.

2.     Sometime around 7:30 p.m. on September 28, 2000, Plaintiff's wife, Kimberly Camm, a 36-year-old working mother, and Plaintiff's two minor children, Bradley Camm, age 7, and Jill Camm, age 5, were inside their garage at their home at 7534 Lockhart Road in Georgetown, Indiana. Unbeknownst to them, Charles Boney was also present.

3.     Boney, on probation from a 20-year prison sentence, was a notorious felon with at least 11 prior arrests and/or convictions in Indiana for offenses including: robbery resulting in bodily injury (4); robbery while armed with a deadly weapon (2); and confinement with a deadly weapon (3).

4.     At least four of Boney's prior offenses concerned his sexual fetish with the feet and shoes of attractive women.

5.     Boney entered into the Camm's garage that evening with the intention of murdering Kimberly, Brad, and Jill Camm.

6.     Boney executed the two children, shooting Jill in the head and Bradley in the chest. Both were still in the family's Bronco when he fired one shot into each of them.

7.     Either prior to or after killing the children Boney physically assaulted Kimberly Camm and then shot her in the head.

8.     When Mrs. Camm's body was found, she had a torn nail on her right hand, and numerous bruises and abrasions on her neck, face, chest, chin, both elbows, left knee, toes and

feet.  Her white pants had been removed.

9.      In addition, Kimberly Camm's socks and shoes had been removed and were found neatly placed on top of the Bronco.

10.      Mrs. Camm was still wearing her blue sweater, but the only clothing on the lower half of her body was a pair of black panties, which were not on correctly and partially folded over.

11.      From the crime scene, it was obvious that Kimberly Camm was in a struggle for her life and fought ferociously with her attacker. Some of Kim's injuries were defensive in nature. Other injuries were indicative of an attempt by her attacker to control her.

12.      It was further obvious that Mrs. Camm was the victim of a sexual assault. Her white underwear was missing, and had been replaced with black underwear. This was undoubtedly the work of Charles Boney.

13.      A female police officer on the scene noted that it was unlikely that any professional woman would wear black underwear underneath white pants.

14. However, the aforementioned officer's observations and opinions were completely discounted because they did not fit the conclusion to which Defendants had already rushed, i.e., that Plaintiff David Camm had murdered his family.

15.      Boney, the actual murderer, left behind a trail of evidence demonstrating his involvement in the crime.

16.      The evidence that Boney left was of a nature that any reasonably prudent law enforcement officer should have recognized it.

17.      Boney left evidence including but not limited to:

a) his prison-issued sweatshirt with his nickname ("BACKBONE") prominently

displayed in the collar;

b) his DNA in the collar of the sweatshirt, along with the DNA of his girlfriend;

c) his handprint prominently displayed on the passenger side of the B-pillar of the Bronco;

d) his handprints and DNA on the victims' bodies;

e) his handprints and DNA on Kimberly Camm's shoes, which were neatly placed upon the Bronco for probable removal by Boney.

18.    In addition, defendants found two hairs on Kimberly Camm's thighs with root material on them that were never tested.

19.    Defendant Stanley O. Faith, acting as the Chief Investigator, immediately took charge of the scene of this triple murder.

20.    Defendants, Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Vaught, Toran, M. Henderson, Fessel, Stites, along with officers Dave Franklin, Greg Oeth, Kyle Brewer, Paul Jefferson, and Joe Vetter utterly failed to use the available physical and eyewitness evidence to investigate the crime properly and apprehend Charles Boney.

21.    At that time, Boney was known to Defendants to be a frequent offender who was suspected of and/or had committed other violent crimes of a sexual nature.

22.    Instead, under apparent pressure from the public to demonstrate immediate progress in the investigation of this heinous crime, within less than three days, the Defendants fixated on 36 year-old David Camm, as the prime (and only) suspect in their investigation, despite the complete absence of any evidence linking him with the crime, and manufactured a case against him.

23.    While the Camm family was being murdered, David Camm was approximately

three-and-a-half miles away playing basketball at his church.

24.    The individuals who witnessed David playing basketball from approximately 7:00 p.m. until approximately 9:22 p.m. on September 28, 2000, included Jeff Lockhart, Martin Dickey, Jeff Dickey, Jeremy Little, Scott Schrank, Mark Wernecke, Tony Ferguson, Jr., Phillip Lockhart, Sam Lockhart, Eric Minzenberger and Tom Jolly.

25.    These eleven eyewitnesses confirmed Plaintiff's alibi, and were consistent in their stories throughout his entire 13-year prosecution.

26.    During the initial investigation, David Camm was completely cooperative with law enforcement, in ways including but not limited to the following:

      a)    he gave consent to all officers present to search his home and cars;

      b)    he voluntarily appeared at the police department without counsel for numerous interviews, two of which were recorded;

      c)    he volunteered to take a polygraph examination;

      d)    he voluntarily allowed the investigators to take the clothing that he was wearing on the night of the murders;

      e)    he voluntarily agreed to two physical examinations.

27.    In short, at no time did Camm behave in a way that was uncooperative or in any way consistent with guilt.

28.    Plaintiff submitted to Defendants' requests for the above-described items despite the fact that numerous officers told him that they had to "clear him" first.

29.    Instead of clearing Plaintiff, Defendants willfully, wrongfully, maliciously and/or recklessly, and unconstitutionally:

      a) arrested him;

b) prosecuted him;

c) incarcerated him; and in all respects

c) framed him for the murders of his wife and two children.

30.     Compounding the tragedy of Mrs. Camm, Bradley Camm, and Jill Camm's deaths and David Camm's imprisonment for a crime he did not commit, Defendants allowed the actual killer, Charles Boney, to remain free and at large for nearly five years.

31.     It is unknown to what extent Charles Boney engaged in other criminal acts from September, 2000 until March 4, 2005, when he was finally arrested.  What is known is that Boney repeatedly attacked his own wife and even solicited help in attempting to kill her.

32.     David Camm spent approximately 13 years in prison and fought through three jury trials in order to prove his innocence and redress the murder of his family.

33.     Defendants conspired to ignore the actual evidence linking Boney to the murders, and to target Camm for crimes that he clearly did not commit.

## THE FAKE EXPERT

34.     Once Faith took over the investigation and processing of the crime scene, he notified Indiana State Police (ISP) that he was going to use his own blood expert and crime scene re-constructionist.  Faith insisted on using his "guy."

35.     The day after the Camm Family murders, Faith placed a call to Defendant Rodney Englert who agreed to send his "assistant," Defendant Robert Stites, to the crime scene.

36.     Englert told Stites to go by his house and pick up his forensic analysis equipment that he kept in a large trunk. Stites did so, and thereafter was flown from Oregon to Louisville, where he began work on the Camm case at a rate of $250 per hour.

37.     Faith's "investigator," Defendant Tony Toran, picked up Stites and took him to

the crime scene.

38.     Stites was given unlimited and free access to everything on the authority of Faith. He had access to the Camms' garage, Bronco, and house. He had access to all the physical evidence, including the clothing found at the crime scene. Stites even examined the bodies of all three victims on two separate occasions.

39.     No one ever requested Stites' credentials, made any inquiry into his qualifications, or challenged his authority in any way.

40.     Upon information and belief, Faith told Clemons, Niemeyer and other members of the ISP that Stites was an expert on blood stain interpretation and crime scene reconstruction.

41.     While at the crime scene Stites:

        a)      took hundreds of photographs;

        b)      made detailed notes and sketches of the crime scene, including his findings regarding blood flow (with the supposed additions of cleaning solutions  and water);

        c)      walked through the entire house and exterior;

        d)      tested a shower curtain and trap on the Camms' septic tank for blood evidence;

        e)      walked through and observed the Camms' breezeway and back deck;

        f)      took measurements, noting bullet locations and penetrations on the victims' bodies at the Kentucky Medical Examiner's Office to reach trajectory conclusions;

        g)      conducted luminol tests inside the garage and the Bronco to detect  trace amounts of blood;

h)      looked for footprints;

i)      examined David Camm's t-shirt (and was told the shirt belonged to the shooter);

j)      told ISP personnel that he was 90% sure the stains on David's shirt were "high velocity impact spatter" or staining.   Later after a telephone call with Englert, he claimed that he was now 100% sure of the high velocity impact spatter;

k)      issued numerous orders to police personnel resulting in the collection   of various items;

l)      attempted to "mentor" unqualified investigators from the   Prosecutor's office;

m)      engaged in the contamination and spoliation of evidence;

42.     Stites consulted with Faith regarding his findings, and as a result, Stites' conclusions were used in the Probable Cause Affidavit that charged David Camm with murder and other crimes.

43.     The Probable Cause Affidavit states, "Robert Stites, crime scene reconstructionist."

44.     It was later revealed that every single opinion and/or conclusion of Stites that appeared in the Affidavit was incorrect.

45.     During David Camm's first trial in January 2002, Stites perjured himself by lying about his capabilities and qualifications. His untruthful statements include but are not limited to:

a)      "I am a crime scene re-constructionist."

b)      "I do crime scene reconstruction and blood spatter work."

c)      "I'm a professor at Portland State University."

d)      "I teach graduate classes in blood spatter analysis, crime scene

reconstruction and evidence extraction."

e)   "I'm also working on my Masters and PhD on fluid dynamics…(with) about sixty hours in graduate credits so far."

f)   Stites also testified that he had taken chemistry, physics and other hard sciences.

g)   "I, uh, investigate homicides for the U.S. Army and I'm also working for Naval Intelligence. . . . I worked for the Department of Justice and also the FBI contracts me directly to work their homicide cases for 'em."

h)   "I've probably testified in about fifteen to twenty different courts."

i)   In response to the number of crime scenes he had responded to, Stites testified, "geez, hundreds." "Uh, lately I've been handling about thirty homicides a year….I think about three years ago it might have been like five. It keeps going up every year."

46.   During his December 5, 2005, deposition in Portland, Oregon, Stites' testimony was very different.  In his deposition testimony he admitted the following:

a)   When he was examining David Camm's T-shirt and jacket they were referred to as those of the "suspect."

b)   Prior to the Camm case, Stites had never taken a bloodstain pattern analysis course.

c)   Stites was not a member of any bloodstain, crime scene reconstructionist, or forensic association.

d)   He was just at the Camm scene to "take pictures and notes" and nothing else.

e)      He only had an undergraduate degree in economics.  He began to   testify that he was "working on" a master's degree in "fluid dynamics" even        though Portland State University did not offer such a program.  He later recanted  that assertion.

f).      He  admitted  that  prior  to  the  Camm  scene,  he  had  never  before processed a homicide scene.  He also admitted that the Camm scene was his first,  and that he had only been physically present at one other previous homicide scene        (which he only guarded).

47.      During David Camm's second trial, in January 2006, Robert Stites' ever-changing testimony continued to contradict his prior statements.

48.      The  significant  statements  made  by  Stites  at  this  trial  during  his  direct examination include but are not limited to:

a)      Stites  "was  strictly  going  to  be  his    [Englert's]  note-taker  and  his photographer."   Nonetheless,   Stites   also   acknowledged   that   he   used phenolphthalein to presumptively identify the presence and location of blood.

b)      Stites   acknowledged   examining   Camm's   clothing   and   using phenolphthalein on four stains on the shirt.

c)      Stites concluded there was "high impact spatter" on the shirt.

d)       Stites admitted to testing with luminol in the garage and Bronco.

e)      Stites  testified  this  was  the  first  crime  scene  he  had  documented  for Englert.

49.      During Stites' cross-examination at Camm's second trial, he testified as follows:

a)      Stites admitted that had never worked on his Masters or his PhD in Fluid Dynamics, nor had he ever been accepted into such a program.

b)      Stites admitted that at the time he testified he was in such a program in 2002, he actually was not even attending classes.

c)      Stites admitted that he had not taken any classes of any kind from   1993-2005.

d)      Stites admitted that he flunked chemistry when he took it in college.

e)      Stites admitted that although he had formerly testified that he was teaching physics classes, he has never even taken a basic course in physics.

f)      Stites admitted that he was not a "crime scene reconstructionist" in September 2000.

g)      Stites admitted that he never processed a homicide scene by          himself prior to September 2000.

h)      Stites admitted that he had never taken the basic bloodstain pattern analysis course as of September 2000.

i)      Stites admitted that he had never taken a proficiency test in bloodstain pattern analysis as of September 2000.

j)      Stites admitted that he is not a member of any bloodstain pattern analysis or forensic science associations.

k)      Stites admitted that he has never been independently hired as a bloodstain pattern analysis by anyone other than Rod Englert. He also acknowledged Englert and his father became friends when they were both law enforcement officers.

l)      Stites admitted that when he examined Camm's clothing in September 2000, he had never testified as a bloodstain pattern analyst.

m)      Stites admitted that his prior testimony from the 2002 trial regarding his prior testimony as a bloodstain pattern analyst was false.

n)      Stites testified that he did not know that he was going to Indiana to analyze the evidence in September 2000, and that his job was just to photograph and take notes. Allegedly, Englert was not expecting him to come up with any conclusions.  Stites then testified that Englert was pleased with his work.

o)      Stites admitted that his examination of Kim, Brad and Jill Camm   were the first bodies he had ever examined related to a crime scene.  He admitted that prior to reviewing the bodies he was not told the following crucial pieces of information:

   i)      Kim's pants were off and she was found in her underwear;

   ii)      Jill was found in the back seat of the Bronco and still in her seatbelt;

   iii)      Brad had been removed from the Bronco by Plaintiff and laid on the floor to conduct CPR (Stites testified that he "may or may not" have been told about Plaintiff and the CPR by the time he examined the t-shirt);

p)      Stites further testified that he did not know the State of Indiana relied on his opinions as a "crime scene reconstructionist" to justify the arrest of Plaintiff, but was then impeached based upon the fact that gave a completely contrary response to the same question in his a deposition a month prior.

q)      Furthermore, Stites acknowledged in his own handwritten notes that on the day of Camm's arrest, Stites "Met with Stan Faith, the prosecutor, to discuss probable cause";

r)      Stites testified that he never told Clemons that bleach was added to Kim's blood flow.

## "PROBABLE CAUSE" AFFIDAVIT

50.      After three days of shoddy and unlawful "investigation" practices, Defendant Clemons swore out an affidavit which contained false information.

51.      The aforementioned affidavit was also signed by Defendant Faith.

52.      Defendants knew or should have known that the affidavit contained false information.

53.      Defendants Faith and Clemons relied heavily on the manufactured and false opinions of their fake "expert," i.e., Defendant Stites.

54.      Examples of the clearly erroneous opinions in the affidavit are as follows:

a)      "The crime scene was manipulated by use of a high pH cleaning substance." This was a false deduction by a false expert. No forensic tests, laboratory tests or analysis had been conducted of any evidence at or from the crime scene on October 1, 2000.  Several evidence technicians and other police officers testified they did not smell any bleach or other cleaning substance in the garage crime scene.  Subsequent laboratory testing failed to detect any cleaning substance on the garage floor.

b)      "The tee shirt worn by David R. Camm on the above-mentioned date had high velocity blood mist which occurs in the presence of gunshot at the time of the shooting." Stites manufactured this opinion either by himself or with the aid of other Defendants. Stites only had an economics degree and was completely incompetent to form any opinions on any crime scene. Furthermore, irrespective of his education (or lack thereof), Stites' opinion is totally outlandish. There were only 8 droplets of blood from

Jill Camm on David Camm's shirt; a fact which would be entirely consistent with blood transfer as a result of Plaintiff pulling Bradley Camm out of the Bronco in an attempt to conduct CPR. Stites' conclusion was that high-velocity blowback from a gunshot wound had sprayed the interior of a raised garage door. His deduction of purported blowback on the garage door could therefore have only been from the gunshot wound of Kim Camm, since the other two victims were inside the vehicle. Plaintiff's shirt did not have any blood from Kim Camm on it. The blowback on the garage door was later determined to be motor oil.

c) "The cleaning substance was thrown over the back deck of the above-mentioned house also leaving a trail from the garage area, along with a transfer of blood on the house." No testing or analysis was done prior to the probable cause affidavit. These spots, including spots under a flower pot, were later determined to have originated several months prior to the murders and during the time David Camm was power-washing his deck with a detergent-based liquid.

d) "A witness said that between 9:15 p.m. and 9:30 p.m. she heard three distinct sounds that can be interpreted as gunshots." This is a manipulated misstatement of fact. The witness was Deborah Ter Vree, Plaintiff's aunt, who lived in the woods approximately 500 feet from the Camm garage. She was interviewed by the probable cause affiant (Defendant Clemons). She consistently characterized the sounds she heard as "thumping noises." Ter Vree states in her taped interview: "…I couldn't figure out what it was and it was like somebody banging on my house and I thought [her husband] Bob's banging on the computer." "It was like you'd take your fist and thump like that" [Ter Vree then hit the dashboard of Clemons' ISP vehicle in quick succession]. At no

time whatsoever did Ter Vree, who was very accustomed to hearing gunshots in the woods around her rural residence, characterize or refer to the noises as being gunshot sounds. In fact, she has repeatedly testified they did *not* sound like gunshots. At no time during her interview were gunshots even mentioned, and Clemons never asked her if the sounds she heard could have been gunshots. Furthermore, upon arrival at the scene, several ISP officers saw and/or heard a grief-stricken David Camm hitting the tailgate of his vehicle three times with his fist. One officer described the punches as "roundhouse punches." A neighbor, approximately one-third of a mile away, was interviewed on the morning of September 29th and described those same three sounds as though someone was hitting a door and not as gunshots.

e)  "Jill Camm, age 5, had a recent tear in the vaginal area consistent with sexual intercourse." According to Jill's autopsy report, the injuries were "Blunt trauma of the external genitalia (hymen intact)." A thorough examination of Jill was conducted and no evidence of sexual molestation or intercourse was discovered.  Present at Jill's autopsy was ISP Evidence Technician, Defendant Sam Sarkisian. Sarkisian and Clemons are responsible for mutating an external injury into an unfounded allegation of sexual molestation. Over the last 14 years there has been no credible evidence discovered or presented that Jill Camm was molested by anyone. Defendants completely manufactured the molestation in an effort to prejudice Plaintiff in his criminal prosecution. Per Sarkisian's later testimony, during a call to Clemons during the autopsy, he said "…there was a…it appeared that the child had been molested…" Within an hour of receiving that call and based upon that call, Clemons applied for a search warrant for Camm's house, falsely claiming "The female child victim has indicia of sexual molestation."  Two days

later and with absolutely no other evidence, analysis or examinations to support his claim, Clemons' story had morphed into the allegation that Jill had a "recent tear in the vaginal area" "consistent with sexual intercourse."

f)      "There is a wet mop in a bucket in the utility room of the house at the above-mentioned address with the strong odor of bleach." This statement, of course, is not evidence of any probable cause; most residences have mops, buckets, and bleach. The statement was yet another contrived allegation intended to manufacture the appearance of probable cause.

g)      "Witnesses playing basketball with David R. Camm said that he left the game on or around 9:00 p.m. and David R. Camm told them he was headed to his house, the above-mentioned crime scene." This was another blatant misstatement of fact.  There were seven witnesses (in addition to David Camm) who played basketball past the normal quitting time of 9:00 p.m.   All were interviewed by the ISP prior to the presentation of the affidavit. The quitting times were estimated as 9:15 (2 people); 9:15-20 (1); 9:20 (2); 9:20-25 (1) and 9:30 (1).  The Sonitrol alarm for the gym was set at 9:22 p.m., which was the time other witnesses saw David Camm leave the gym. In any event, the murders happened around 7:30 p.m. and even if Camm left the gym at 9:00 p.m. that would have no relevance or impact on the crimes committed other than strengthening Camm's alibi. Defendants' shoddy three-day  investigation miscalculated the time of the murders. Their singular focus on Camm interfered with standard investigation practices, which would have conclusively ruled out the Plaintiff as a suspect.

h)      "There was a flow of blood from the garage that is inconsistent with the viscosity of blood and was aided in its flow by the presence of water and cleaning

substance." At least three ISP Evidence Technicians at the crime scene recognized the natural phenomenon of blood-serum separation. Invited to the crime scene by the ISP was the pathologist who conducted the autopsy of Kimberly Camm, Dr. Donna Hunsaker. She, too, testified the flow of blood was consistent with blood-serum separation.  At the time of Stites' false conclusion, there had been no analysis of the blood flow. Subsequent to the affidavit, laboratory results were negative for a cleaning solution.

### CHARLES BONEY'S SWEATSHIRT

55.     One of the most obvious pieces of evidence left at the scene of the crime was the prison-issued gray sweatshirt of Charles Boney.

56.     The sweatshirt was not accounted for at the scene and ended up in the body bag of Bradley Camm.

57.     The sweatshirt was not discovered until Bradley's body was examined by Kentucky Medical Examiner, Tracy Corey.

58.     The sweatshirt had Charles Boney's prison nickname, "BACKBONE" prominently displayed in the collar.

59.     Lynn Scamahorn, a DNA analyst at the Evansville post of the Indiana State Police Lab, found multiple bloodstains on the sweatshirt.

60.     Scamahorn determined, through DNA analysis, that some of the stains were from the victims, some of the stains were from an unknown female, and some of the stains were a mixture from an unknown female and the victims.

61.     Scamahorn ran the unknown female's blood through the CODIS databank and found no match.

62.     Scamahorn has testified repeatedly that it is procedure to run any unknown DNA

found at the crime scene through the CODIS databank.

63.     David Camm's DNA was nowhere on the sweatshirt.

64.     Scamahorn has testified that Defendant Faith threatened her with termination and prosecution for obstruction of justice if she refused to testify that Camm's DNA could have been on the sweatshirt.

65.     This testimony regarding Faith's behavior was known by Defendant Henderson, who did nothing in response, and in fact continued to aggressively prosecute Plaintiff.

66.     The unknown female was later determined to be Mala Singh, Boney's live-in girlfriend at the time of the murders.

67.     During the discovery phase of the first trial, the defense team sent the sweatshirt to a highly accredited private lab, Orchid Cellmark, because Defendant Faith refused to send the sweatshirt for DNA testing.

68.     In approximately October 2001, Cellmark discovered unknown male DNA on the collar of the sweatshirt.  Faith never told Scamahorn about this finding.

Had Faith told Scamahorn about Cellmark's finding, she would have followed the applicable procedure and run the DNA profile through the CODIS system.

69.     In October 2001, Charles Boney was in the CODIS system.

70.     In fact, Boney's DNA has been in the CODIS system since 1997.

71.     Camm's original criminal defense attorney, Mike McDaniel, has testified that after asking Faith to run the DNA profile through the CODIS system, Faith told him that he ran it and there was no match.

72.     Paul Misner, the Indiana Director of CODIS previously testified that that there was no record of the unknown DNA being run through the CODIS databank.

73.     Since the discovery of Boney's involvement in the Camm murders, Faith has given multiple inconsistent statements to explain his failure to discover Boney despite the fact that Boney's DNA was in the CODIS databank.

74.     One such story is that Faith said that he gave the DNA profile to Detective Clemons. According to Faith, Clemons allegedly ran it and told Faith there was no match.

75.     Clemons denies that he was ever asked to run the DNA profile.

76.     After the discovery of Boney's DNA, finally in March, 2005, ISP matched Boney's handprint on the passenger B-pillar of the Bronco.

77.     Faith had previously pressured ISP trace evidence analyst, John Singleton, to testify that the handprint could have been David Camm's.   Singleton rightfully declined to perjure himself.

78.     Four-and-a-half years after the murders, and after Camm's first conviction was reversed, the Camm defense team had to move the court for an Order requiring the prosecution to run the DNA profile through the CODIS system. The DNA was a perfect match to the murderer, Charles Boney, who had been given a three-year early release from prison only three and half months prior to the murders of the Camm family.

79.     For four-and-a-half years, Defendants originally linked this crucial piece of evidence to David Camm, and then referred to it as an "artifact" even through it had unidentified DNA throughout.

80.     Faith went to great lengths to conceal the DNA on the sweatshirt, which was a critical piece of exculpatory evidence. When the truth came to light, he lied and created multiple stories in order to absolve himself of culpability and/or to further the bogus prosecution of the Plaintiff.

## FAITH'S CONNECTION TO CHARLES BONEY

81.     Throughout the thirteen-year saga, Camm's defense team came to some startling revelations regarding the connections between Defendant Stan Faith and Charles Boney.

82.     Boney's mother, Barbara Boney, has been a long time political supporter and friends with Stan Faith.

83.     She often baked pies and cakes and brought them to Faith's office for his and his staff's enjoyment.

84.     In addition, Stan Faith was listed as a reference on Barbara Boney's application for employment at a nearby riverboat casino.

85.     After Boney was released from prison on June 19, 2000, he failed to submit to the guidelines of his probation which had been transferred to Floyd County, Indiana.  A warrant was eventually issued out of Monroe County, the site of his last convictions. Boney was arrested in Louisville, Kentucky in early January 2004, and transferred to Bloomington, Indiana.

86.     Boney hired Faith to represent him in that matter, State of Indiana Cause No. 53C04-9210-CF-542.

87.     During that representation in open Court, Faith stated, "Boney was a good citizen," and "he has a very nice mother."

88.     Nothing was said by Faith during that proceeding about Boney's estranged wife, Amber, filing an Emergency Protective Order in Louisville just before he was arrested wherein she claimed that Boney threatened to kill her with a gun.

89.     Boney later related that Faith was a longtime "friend of the family" and that on the way home from court in Bloomington to New Albany, the two discussed the Camm case at length.

90.     Boney would not disclose the details of this conversation with Faith because he stated he did not want to "betray" Faith.

91.     After Boney was released he went to visit Faith in his office on two or three occasions.

92.     In addition to representing Charles Boney in a criminal capacity, Stan Faith also represented Charles Boney in his divorce action, 53C06-9012-DR-841.

93.     According to Indiana Court records, Faith filed his entry of appearance in the divorce action on June 8, 2004.

94.     On October 11, 2005, seven months after Boney was charged with the murder of the Camm family, Faith filed a Motion to Withdraw on the basis that Boney had been charged with murder in a case that Faith had been a prosecutor.

## ADDITIONAL FABRICATED CHARGES

95.     Only years later, after Camm's insistence on running a DNA profile from the sweatshirt, did Defendants finally start to look into the possibility that Boney had committed the murders. Unfortunately, the DNA match, the handprint match, and all of the other physical evidence at the scene that undeniably placed Boney there was not enough for the Defendants to admit they were wrong and dismiss the charges against David Camm.  Instead, a second group of individuals decided to continue what had already been started, and manufactured "a new case" against David Camm. This time, Defendants alleged that Plaintiff was acting in concert with Boney.

96.     On February 17, 2005, Defendant Gilbert and Defendant Kessinger interviewed Charles Boney at Keith Henderson's office.   At that time, Boney admitted that the above-described sweatshirt was his.

97.     On or about February 18th, 2005, Charles Boney submitted to a polygraph examination, which he failed.

98.     On February 18, 2005, Defendants Gilbert and Kessinger again interviewed Boney at the office of Defendant Keith Henderson.

99.     Between February 19th, 2005 and March 4, 2005 (prior to Boney's arrest), Charles Boney made 29 telephone calls to the Floyd County Prosecutor's office, and received four (4) calls from the same office.

100.    On February 23, 2005, Charles Boney visited the Floyd County Prosecutor's office once again.

101.    Defendant Gilbert documented the visit.  Per the report, in a visit that lasted 1.5 hours, Boney was only asked one question, "Did you research the Camm case?"

102.    On or about February 28, 2005, Defendants held a press conference and announced to the public that Charles Boney's story "checks out."

103.    This false statement was made despite the fact that no one had investigated Boney's story, and in fact Defendants knew that his story did not "check out."

104.    On March 4, 2005, defendants Gilbert and Kessinger conducted a third interview of Charles Boney.  This interview was incident to his arrest.

105.    On that same date, Gilbert and Kessinger gave Charles Boney four hours to write a statement.

106.    After Boney wrote his "statement," Defendants Gilbert and Kessinger interviewed him again.

107.    On or about March 5, 2005, Charles Boney was arrested and charged with 3 counts of murder, possession of firearm by a felon, and being a habitual offender.  Absent from

the charges was any indication of conspiracy between Boney and Camm.

108.   On or about March 7, 2005, Charles Boney's legal counsel withdrew from representation, for reasons as yet unknown to Plaintiff.

109.   On the same day Boney's counsel withdrew (March 7, 2005), at 3:48 P.M., Defendant Henderson personally requested Defendant Myron Wilkerson (a distant relative of Charles Boney) conduct an interview of Charles Boney with the approval of defendants Gilbert and Kessinger.

110.   During the entire interview, Defendant Wilkerson suggested to Boney that in order to save himself from the death penalty, he needed to inform him of any connection he had to David Camm.

111.   During the interview, Wilkerson suggested various ways Boney might connect himself with the Plaintiff.

112.   On March 7, 2005, at approximately 7:55 P.M., after the Wilkerson interview, Defendants Gilbert and Kessinger interviewed Boney for the sixth and final time.

113.   Gilbert and Kessinger stated that they needed to "straighten out some of the inconsistencies that just aren't making sense."

114.   In reality, Gilbert and Kessinger, acting in concert with other Defendants, were assisting Boney in manufacturing a more convincing story for the purpose of furthering the bogus prosecution of the Plaintiff.

115.   All the aforementioned interviews were conducted at the direction of and/or in consultation with Keith Henderson. Henderson also had direct contact with Boney.

116.   Keith Henderson provided Boney the contact information for a member of the media which would allow Boney to tell his "story."

117.    In the interviews with Boney, Defendants used unlawful tactics by coercing Boney into fabricating a false confession that would also implicate David Camm, despite the fact that Boney clearly committed these murders alone.

118.    At approximately 11:04 PM on March 7, 2005, after conducting six interviews with Boney, Defendant Kessinger declared Boney's story to be a "crock of shit" and a "cock and bull story," which had clearly been orchestrated to minimize Boney's involvement.

119.    Defendant Gary Gilbert claimed Boney's story to be one of "convenience," and told Boney that he did not have his "story straight."

120.    Wilkerson added that Boney had "given me nothing to put you with [Plaintiff]."

121.    Boney's story did not match up with the physical evidence, the timing of the events in question, his fabricated alibi, and the involvement of his fabricated arms dealer, Larry Gerkin (a.k.a. "Slim").

122. No witness (aside from Boney himself) has ever linked Boney with Camm in any way.

123.    Contrary to Boney's story, no witness has ever seen the two playing basketball together, no one saw them together at any location, there were no records of them communicating telephonically, there were no emails between the two of them and there was no plausible explanation of how they ever met with each other.

124. Furthermore, Kim, Brad, and Jill were with Janice Renn at the time that Boney initially claimed Camm killed them.

125. Furthermore, the idea that Plaintiff, a veteran police officer, would have conspired with Boney, a notorious multiple felon, to do *anything* – let alone murder his wife and two children – is ludicrous. Defendants knew this and continued their efforts to use Boney to

prosecute Plaintiff.

126.    Barbara Boney was approached by Defendants for the purpose of suggesting to her son that he needed to sign a "conspiracy note," and that signing a conspiracy note would save her son's life.

127.    Despite a total lack of evidence, and without probable cause, on March 9, 2005, Defendants Henderson and Gilbert filed new charges against Camm.

128.    The new charges against Camm included the previous charges but added a conspiracy charge.

129.    Henderson also filed a motion to drop the previous charges, which were still at issue in the Warrick County Circuit Court.

130.    The prior case against Camm had been moved to Warrick County because of the extreme publicity and resulting prejudice to Camm.

131.    Henderson's motion to dismiss was a transparent attempt to move the case from Warrick County back to Floyd County, in order to leverage public prejudice and use it against Camm. Henderson's attempt to move the case was ultimately unanimously rejected by the Supreme Court of Indiana.  Nonetheless, Henderson's actions unnecessarily delayed the trial and lengthened Camm's incarceration.

### HENDERSON'S PROFIT MOTIVE TO CONVICT CAMM

132.    Either prior to or during David Camm's second trial, Defendant Henderson, while still serving as Floyd County Prosecutor, negotiated a "literary representation agreement" for a book that Henderson intended to write about the Camm case.

133.    At midday on March 3, 2006, hours before the jury reached a verdict in the second trial, Literary Agency East, Ltd. sent Henderson's wife an email together with a draft

agreement to find a publisher for his book.

134.    Upon information and belief, the fact that the agency sent the aforementioned email to Henderson's wife (instead of Henderson himself) indicates that Henderson was well aware of the inherent conflict his prospective book deal posed.

135.    On March 10, 2006, Henderson signed the agreement.

136.    On March 28, 2006, at the conclusion of Camm's second murder trial, the trial court sentenced Camm to life without parole.

137.    Frank Wiemann served as Henderson's agent and Steve Dougherty acted as his "co-author."

138.    Together, they wrote a sixty-page proposal for Henderson's forthcoming book about the Camm case, which Wiemann sent to several publishers.

139.    On June 3, 2009, Wiemann negotiated a publishing agreement with Berkley Penguin Group ("Penguin") for Henderson's book tentatively titled, "Sacred Trust: Deadly Betrayal." Henderson and his new co-author Damon DiMarco each received an advance of $1,700 and agreed to deliver manuscripts to the publisher by August 1, 2009.

140.    On June 26, 2009, the Supreme Court of Indiana reversed Camm's conviction again, due to Henderson's misconduct during the second trial.

141.    Henderson's zealous prosecution of Camm for crimes which he knew or should have known were only supported by falsified, exaggerated, and/or manufactured evidence was motivated by Henderson's potential for personal financial gain.

142.    Following the Supreme Court decision, Henderson filed a petition for rehearing.

143.    After the Indiana Supreme Court reversed Camm's conviction, Penguin decided to delay any decision to move forward with the book until the outcome of the petition for

rehearing was known.

144.    On July 30, 2009, Henderson sent an email to Wiemann raising several concerns he had should the State's petition for rehearing be denied.  Among the concerns were:

        a)      whether or not to bring Camm to trial for a third time;

        b)      whether it would jeopardize the case against David Camm if the book came out prior to the third trial;

        c)      whether he could be removed from the case if the book came out; and

        d)      if, by cashing the check from the publisher, he would be agreeing to a time frame which would put his future involvement in the prosecution in jeopardy.

145.    Henderson also wrote to his literary agent, ". . . this is now a bigger story."

146.    Shortly thereafter, Wiemann communicated Henderson's concerns to Penguin. Penguin believed that the best solution to avoid compromising Henderson was for him and his co-author to return the advance checks and to cancel the contracts.  Penguin suggested the parties could "always start over again after the completion of the legal process."

147.    On November 30, 2009, the Indiana Supreme Court denied Henderson's petition for rehearing. Three days later, Henderson re-filed the murder charges against Camm.

148.    Later the same day, Camm filed a verified petition for appointment of a special prosecutor, seeking the removal of Henderson as prosecutor due to his obvious conflict, i.e., the pecuniary gain from a book about the "bigger story" of yet another trial.

149.    Nonetheless, Henderson refused to step down in the face of a clear conflict of interest.   His refusal elongated David Camm's incarceration and criminal prosecution for approximately two more years.

150.    On November 15, 2011, the Indiana Supreme Court determined by clear and

convincing evidence that Henderson had an actual conflict of interest.   The Court found, "Henderson has established a personal agenda to both write this book and ensure that Camm is prosecuted.   Henderson's own words are evidence of that agenda."   "As prosecutor, Henderson should not have a personal interest in this case separate and apart from his professional role as prosecutor."

151.   Henderson's personal financial interest and agenda further damaged Camm by forcing him to endure a third trial, and by elongating his incarceration for an additional two years.

## THE TRIALS

152.   On January 14, 2002, Plaintiff's first murder trial began in Floyd County, Indiana, using jurors from Johnson County due to the extensive media coverage of the crime in the Louisville area. The lead attorney for the state in the first trial was Stan Faith, who acted both as both investigator and prosecutor on Plaintiff's case.

153.   On March 15, 2002, the Jury began to deliberate.

154.   On March 17, 2002, the Jury informed the trial court that it was deadlocked.   The trial court instructed the jury to keep deliberating.   Later that day, the jury returned guilty verdicts on all three counts.   Camm was sentenced to a total of 195 years in prison.   Camm appealed his conviction.

155.   On August 10, 2004, the Court of Appeals of the State of Indiana, reversed the three convictions of murder because "Camm was unfairly prejudiced by the introduction of extensive evidence and argument regarding his poor character, where the evidence regarding his philandering was not reasonably related to any proper purpose under Indiana Rule 404(b), including proof of motive."   Throughout the Court of Appeals opinion, the term the "State" is a

reference to the actions and arguments of Faith.

156.   The Court went on to note that "we are left with the definite possibility that the jury might have found Camm not guilty of murdering his wife and two children if it had not been exposed to a substantial amount of improperly admitted and unfairly prejudicial evidence concerning his extramarital affairs and the State's use of that evidence to portray Camm as a person of poor character who was more likely to commit murder because of his indiscretions."

157.   The irrelevant evidence of past indiscretions was not the only issue that the Court of Appeals addressed in the opinion reversing Camm's convictions.  Even though the Court did not need any additional analysis to overturn the murder convictions for the other evidentiary errors and abnormalities that were briefed, the Court found it best to analyze additional inappropriate evidence that was admitted in error to help with the second trial.  Unfortunately, it fell mostly on deaf ears.

158.   The Court seemed troubled that the State introduced evidence that Jill had "possibly" been molested hours before her death.  The Court noted that the testimony of the medical examiner who conducted Jill's autopsy testified that there was trauma to her genital region consistent with either molestation or a straddle fall; there was no penetration of the hymen, however.  The Court warned the State when it said, "[t]he closer question, it appears to us, is whether the evidence the State presented on this point was sufficiently probative to be admissible." In addition, the Court noted that even if Jill had been molested, there was no evidence that Plaintiff might have had anything to do with it. The Opinion further warned that in the next trial, the trial court will need to carefully consider whether the highly inflammatory nature of this evidence substantially outweighs the probative value of any evidence that Plaintiff had molested his daughter.  This warning would also be ignored in the second trial.

159.    In addition, the Court analyzed the propriety of the State putting on as evidence the known changed testimony of William Chapin, an expert in microscopy, which were outside of the opinions disclosed in his report.  The Court noted that State had a duty to seasonably supplement discovery responses through both the trial order and Trial Rule 26(E)(1). The State did not comply with either of these rules.

160.    The fact that the State went to great lengths to adulterate the evidence, suborn perjury, fabricate evidence, tamper with witnesses, and to introduce prejudicial and or irrelevant evidence without the proper foundation is a blatant illustration of the lack of probable cause to charge Camm with these crimes in the first place.  Unfortunately for Camm, his prosecution did not end here.

161.    Following the reversal and remand, the parties agreed to change venue from Floyd Superior Court to Warrick Superior Court No. 2, and the latter assumed jurisdiction over Camm's case.

162.    The prosecutor in the second trial was Keith Henderson. Henderson, like his predecessor Faith, made a calculated choice to poison the jury with inadmissible character evidence.

163.    Also, as discussed *supra*, prior to the second trial, Henderson dismissed the charges against Camm without prejudice and recharged Camm in Floyd Circuit Court with the three counts of murder and added a charge of Conspiracy to Commit Murder.

164.    Camm contested the re-filing of the case in Floyd County by filing an original action in the Indiana Supreme Court, and the Indiana Supreme Court ordered venue transferred back to Warrick Supreme Court No. 2.  The case was then transferred, and the State sought a sentence of life without the possibility of parole.  This highly questionable maneuver by

Henderson also elongated the prosecution and the detention of Camm.

165.    Camm's second trial in Warrick County began on January 9, 2006.

166.    In the second trial, Camm's defense was that Boney was the sole perpetrator.  In furtherance of this theory, the defense offered evidence of Boney's prior assaults on women and sexual compulsion for feet, his alleged reputation for dishonesty, his failed stipulated polygraph test, and certain inculpatory out-of-court statements.  The trial court excluded all of this evidence.

167.    At the close of the State's case-in-chief, the Court entered judgment on the evidence in favor of Camm on the conspiracy charge that involved Boney.

168.     Once again the State introduced a plethora of improper evidence and speculation upon speculation (especially regarding the alleged molestation) in an effort to poison the jury and get a conviction. The State's theory – that Camm murdered his family to conceal the molestation – pervaded the trial from the State's opening statement to its closing argument. The State presented this proof and argument without any evidence after being forewarned years before in the Opinion of the Indiana Court of Appeals. The introduction of improper evidence to get a conviction at all costs illustrates the lack of probable cause to charge Camm with these crimes, as well as the improper motives of Defendants.

169.    With the Court allowing improper evidence by the prosecution and hindering the defense with the introduction of this evidence, Camm once again was convicted of murder. Camm appealed to the Supreme Court of Indiana.

170.    On June 26, 2009, The Supreme Court of Indiana reversed the convictions of Camm for the second time. The Court correctly identified the primary problem with the State's case when it held,  "[m]issing from the record in the case is any competent evidence of the

premise that the defendant molested his child, a hole in the proof that the State admits." "With no evidence connecting the defendant to the injuries, the inquiry lacked purpose." "The erroneous admission of speculative evidence and argument that the defendant molested his daughter, combined with the State's use of this evidence as the foundation of its case, requires the convictions to be reversed."

171.    As stated previously, Keith Henderson failed to step down as prosecutor in the face of a clear-cut conflict of interest.  On November 15, 2011, Henderson was removed from the case by order of the Supreme Court of Indiana.

172.    The third trial began in Boone County, Indiana on August 12, 2013.

173.    On October 24, 2013, David Camm was found not guilty of the three murders and was released from custody.

## DEFENDANTS' MISCONDUCT

174.    This series of events constitutes a gross miscarriage of justice that was not the result of innocent or negligent mistakes, but instead was caused by the deliberate, reckless and egregious misconduct of the defendants acting in violation of well-established investigative practices and clearly established laws. David Camm's two unjust convictions and years of wrongful imprisonment were the direct result of a veritable perfect storm of misconduct by virtually every actor involved in this investigation and prosecution.

175.    Initially, Stan Faith, his investigators, Stites and Indiana State Police officers investigating the Camm murders targeted David Camm as a suspect without any evidentiary basis, and then failed to investigate evidence pointing to his innocence and another man's guilt. Instead, they built their case against Plaintiff by:

    a)    acting in concert to fabricate opinions by an unqualified "expert" so that    those

opinions could be used to manufacture probable cause to arrest Plaintiff;

b)      suborning false witness statements and testimony (perjury);

c)      concealing evidence that eventually led to the real murderer;

d)      delaying investigation into the evidence that should have led to the real murderer four-and-a-half years prior;

e)      witness tampering and obstruction of justice; and

f)      the general practice of "confirmation bias," where all information was construed to be supportive of Defendants' singular, persistent, nonsensical theory.

176.    Defendants have continued to cover up evidence of their own unlawful misconduct through the present day, and persisted in covering up evidence of Mr. Camm's innocence, including  but not limited to:

a)      conspiring with a fake expert;

b)      concealing evidence that ultimately led to the murderer;

c)      sufficiently testing for all DNA on Boney's sweatshirt;

d)      failing to run Boney's DNA profile through the CODIS system;

e)      lying about running the DNA through the CODIS system;

f)      not running or concealing the results of the inquiry into the search for the nickname "BACKBONE" in the prison database;

g)      denigrating the 11 eyewitnesses to Camm's whereabouts at the time of the murder as either "mistaken or lying"; and

h)      many other known and unknown actions of Defendants.

177.    All named defendants fought Mr. Camm's efforts to prove his innocence from September 28, 2000 until October 24, 2013, the day of his exoneration. The pervasive, systemic

and unconstitutional official misconduct of defendants that led to Mr. Camm's wrongful conviction and his continued wrongful imprisonment did not occur in isolation, outside of official bureaucratic channels. Rather, the actors who deprived Mr. Camm of his constitutional protections and caused him to be wrongfully arrested, prosecuted, convicted, and imprisoned were acting with the direct participation, knowledge, and/or acquiescence of supervisors and policymakers in the County of Floyd, Indiana, and Indiana State Police and pursuant to the customs, policies, patterns, and/or practices of Floyd County Indiana and the ISP the misconduct and egregious failures of training, supervision, and oversight within both agencies.

178. This civil rights action seeks accountability for the official misconduct and abuses of power that led to Mr. Camm's wrongful arrest, prosecution, and convictions, and that robbed him of thirteen years of his life.

## JURISDICTION AND VENUE

179. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

180. Supplemental jurisdiction over Mr. Camm's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

181. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of Indiana, the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

182. Venue is also proper in the Southern District of Indiana pursuant to 28 U.S.C. § 1391(b)(l), as Mr. Camm currently resides within it and, upon information and belief, the vast majority of defendants reside in Indiana.

183. Pursuant to the Seventh Amendment of the United States Constitution, Mr. Camm

requests a jury trial on all issues and claims set forth in this Complaint.

## THE PARTIES

184.    Plaintiff David Camm, is, and at all times material to this Complaint was, a citizen and resident of the State of Indiana. He currently still resides in the State of Indiana.

185.    Defendant Stan Faith ("Faith") is sued in his individual capacity and at all times was acting under the color of state law.  Faith was the elected Floyd County Attorney, in Floyd County, Indiana at the time of the Camm murders.  Faith immediately stepped outside of his traditional role of prosecutor and performed "police duties" by taking over and running the investigation of these murders from the outset, and Faith is at the center of the constitutional deprivations complained of herein. Upon information and belief, Faith completely lacked police training.  Throughout the Complaint, unless otherwise noted, any reference to "investigators" also includes Defendant Faith.

186.    Defendant Detective Sean Clemons, at all times relevant to this complaint was a police officer and/or detective with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Clemons held the title of "detective." Clemons was also provided the title of ISP's "lead investigator" of the Camm murders, but Clemons has testified throughout the criminal proceedings that in reality, Stan Faith was "in charge" of the investigation.  Clemons also signed the "probable cause" affidavit even though he knew or should have known that probable cause did not exist on any of the charges against David Camm.

187.    Defendant Detective Sam Sarkisian at all times relevant to this complaint was a police officer and/or detective with the Indiana State Police, acting under the color of law in his

individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

188.   Defendant Sergeant Jim Niemeyer, at all times relevant to this complaint was a police officer and/or sergeant with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana.   Niemeyer had additional duties or responsibilities of hiring, training, and/or supervising ISP officers, including individual defendants named and unnamable in this Complaint. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

189.   Defendant Captain William Walls at all times relevant to this complaint was a police officer and/or captain with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana.   Walls had additional duties or responsibilities of hiring, training, and/or supervising ISP officers, including individual defendants named and unnamable in this Complaint. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

190.   Defendant Sergeant Robert Michael Neal, also known as Mickey Neal at all times relevant to this complaint was a police officer and/or sergeant with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment

pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Neal had additional duties or responsibilities of hiring, training, and/or supervising ISP officers, including individual defendants named and unnamable in this Complaint. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

191. Defendant Lieutenant Jim Biddle at all times relevant to this complaint was a police officer and/or lieutenant with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Biddle had additional duties or responsibilities of hiring, training, and/or supervising ISP officers, including individual defendants named and unnamable in this complaint. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

192. Defendant Lieutenant Jim Hickerson at all times relevant to this complaint was a police officer and/or lieutenant with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Hickerson had additional duties or responsibilities of hiring, training, and/or supervising ISP officers, including individual defendants named and unnamable in this complaint. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

193. Defendant Myron Wilkerson at all times relevant to this complaint was a police officer with the Indiana State Police, acting under the color of law in his individual capacity

within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. As discussed *supra*, Wilkerson aided in the malicious and wrongful prosecution of Plaintiff in various ways including, but not limited to, assisting Charles Boney in falsifying a story of conspiracy to commit murder with the Plaintiff.

194.   Defendant Detective Gary Gilbert at all times relevant to this complaint was a police officer and/or sergeant with the Indiana State Police, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

195.   Defendant Investigator Jacqueline Vaught at all times relevant to this complaint was a police officer and/or investigator for Floyd County, Indiana, acting under the color of law in her individual capacity within the scope of her employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana.  Upon information and belief, Vaught did not have a law enforcement background and lacked the necessary training to perform her job competently. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that she knew or should have known of the Plaintiff's innocence.

196.   Defendant Investigator Tony Toran at all times relevant to this Complaint was a police officer and/or investigator for Floyd County, Indiana acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana.  Upon information and belief Defendant Toran did not have a background in law enforcement and lacked the necessary training to perform his job competently. Defendant aided in the investigation into, and malicious

42

prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

197.   Defendant Investigator Emily Fessel Miller, at all times relevant to this complaint was a police officer and/or investigator for Floyd County, Indiana, acting under the color of law in her individual capacity within the scope of her employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana.   Upon information and belief, Miller did not have a law enforcement background and completely lacked the necessary training to perform her job competently. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that she knew or should have known of the Plaintiff's innocence.

198.   Defendant Keith Henderson, is sued in his individual capacity and at all times was acting under the color of state law.  Henderson was the elected Floyd County Attorney, in Floyd County, Indiana at the time of his involvement.  Upon becoming involved in the case, Henderson stepped outside of his traditional role of prosecutor and performed "police duties" by taking over and running the investigation of these murders that led to the second probable cause affidavit.  In addition, Henderson gained a personal financial interest when he signed a book deal that created a conflict with his role as prosecutor.  His personal financial interest interfered with his duties to the State to faithfully prosecute individuals absent personal interest in the outcome. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.  Throughout the Verified Complaint any mention of "investigator" also includes Keith Henderson.

199.   Defendant Steve L. Owen, is sued in his individual capacity and at all times was acting under the color of state law.  Owen's traditional role was Assistant  Floyd County

Attorney, in Floyd County, Indiana at the time of his involvement.  Upon becoming involved in the case, Owen stepped outside of his traditional role of prosecutor and performed "police duties"  by taking part in the investigation these murders that led to the second probable cause affidavit.  Specifically, Defendant Owen, made suggestions to Charles Boney to help Boney craft his out-of-court statements regarding his involvement in the murders.  Upon information and belief, Owen specifically told Boney that nothing of value was taken from the Camm residence. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.  Throughout the Verified Complaint, any reference to "investigator" also includes Defendant Owen.

200.   Defendant Investigator Barry Wayne Kessinger (known as Wayne Kessinger) at all times relevant to this complaint was a police officer and/or investigator for Floyd County, Indiana, acting under the color of law in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the state of Indiana. Defendant aided in the investigation into, and malicious prosecution of, the Plaintiff, despite the fact that he knew or should have known of the Plaintiff's innocence.

201.   Defendant Robert Stites, was an employee and/or agent of Englert Forensic Consultants, LLC who was acting under the color of state law by investigating the above-described murders. Stites operated under the direction of Defendant Faith, Defendant Englert, and possibly other known and unknown Defendants.  Stites lacked credentials to perform his duties and has admittedly perjured himself regarding his credentials and his "opinions" that led to Camm's arrest and continued prosecution.

202.   Defendant Rod Englert, is an employee and or agent of Englert Forensic Consultants, LLC.  Englert was directly responsible for the supervision or lack thereof of his

employee and/or agent Robert Stites.  Defendant Englert knowingly sent Stites to the crime scene to perform duties that Stites knew he did not have the credentials to perform.  Englert then testified consistently with the "opinions" of Stites to cover up the misfeasance and/or malfeasance of his employee/agent.

203.    Englert Forensic Consultants, LLC, employed and/or was responsible for the retention and supervision of Stites and Englert.   Englert Forensic Consultants, LLC is responsible under respondeat superior liability for the actions of Stites and Englert in the malicious prosecution of Camm.

204.    Defendant Floyd County, Indiana, is a municipality and at all relevant times has been the employer of some or all of the investigators and/or individual police Defendants named herein.  Floyd County, Indiana is responsible for the policies, practices and customs of all non-ISP investigators, non-ISP police officers and non-ISP law enforcement personnel that were involved in this matter.  Floyd County, Indiana was responsible for hiring, retaining, and supervising the fake "expert" Stites and his co-worker Englert.  Faith and Floyd County immediately hired their own "crime scene reconstructionist" even though ISP had its own fully trained and capable personnel.

205.    Unknown Defendants John and Jane Does at all times relevant to this complaint were police officers and/or detectives with the ISP, and/or Floyd County, Indiana, and/or other law enforcement agencies within the State of Indiana, acting under color of law in their individual capacities within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Floyd County, Indiana, the Indiana State Police and/or the State of Indiana.

206.    Unknown Defendants Richard and Roberta Roe supervisors and policymakers

were at all times relevant to this complaint, police officers, detectives, supervisors, agents, employees, and/or policymakers with the Indiana State Police, Floyd County, Indiana, or other law enforcement/state agencies within the State of Indiana, with responsibilities for creating and implementing policies and/or responsibilities for hiring, training, and supervising ISP officers and Floyd County officers, including individual defendants named and unnamed in this complaint, and were acting under color of law in their individual, supervisory and policymaking capacities within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Floyd County, Indiana and the state of Indiana as a whole.

## FACTS

207.   Notwithstanding the absence of any evidence linking Mr. Camm to the crimes, and strong exculpatory evidence, Defendants continued to target Camm as their prime suspect.

208.   To that end, Defendants made a concerted effort to dismantle evidence of Camm's innocence while using pressure, inducements and lies to create evidence of his guilt.

209.   On October 1, 2000, David Camm was arrested and charged on three counts of murder.   David Camm was charged and prosecuted based upon false evidence that was deliberately manufactured by the Defendants and by means of Defendants' affirmative concealment of exculpatory and impeachment evidence. These material misrepresentations and omissions included, but were not limited to, the failure to investigate the alibi statements provided by eleven witnesses who told police they were with Mr. Camm when the crime was committed.

## EXCULPATORY EVIDENCE MOUNTS, BUT THE PROSECUTION CONTINUES IN THE ABSENCE OF PROBABLE CAUSE

210.   As evidence exculpating Mr. Camm mounted, the investigators and/or police nonetheless failed to follow up on any other possible suspects and performed no further

investigation.

211.    Defendants' single-minded focus on David Camm prevented them from identifying and prosecuting the true killer, Charles Boney. Charles Boney was a convict and hardened criminal with at least nine convictions with a pattern of targeting white women. Given Mr. Boney's extensive criminal record, the police defendants were in possession of extensive physical and biographical information about him at the time of the Camm investigation, including his fingerprints and booking photograph, his DNA, his criminal record and the fact that he had been released from prison a few months prior and was still under the supervision of Floyd County authorities.

212.    Mr. Boney had further left a trail of physical evidence linking him to the Camm murders, including his sweatshirt, fingerprints and his DNA.

213.    Upon information and belief, had investigators and/or police compared the latent fingerprints collected from the B-pillar to fingerprint cards from suspects in prior crimes, which were indexed and could be sorted based on fingerprint characteristics, prior arrests, and address information, they would have identified Charles Boney.

214.    The truth was no match for the defendants' lies and fabrications.

215.    From the date of his arrest on October 1, 2000, until his ultimate exoneration on October 24, 2013, David Camm fought tirelessly to prove his innocence, through the courts on direct appeal, a new trial motion, and post-conviction appeals.

216.    From the date of the crime through the present day, the named defendants, also failed to come forward with other material, exculpatory, and impeachment evidence conclusively proving Mr. Camm's innocence, including the truth about their own investigative misconduct.

*Supervisory Defendants Participate in the Ongoing Coverup*

217.     In their supervisory capacities, defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, K. Henderson, Chief Deputy Owen and Englert, as well as other unnamed Richard and Roberta Roe Supervisors, affirmatively concealed or otherwise failed to come forward with material, exculpatory, and impeachment evidence, including but not limited to witness statements provided directly to supervisory defendants identified above during the original investigation, and evidence supervisory defendants knew proved Mr. Camm's innocence. Supervisory defendants also participated in and had knowledge of, yet continued to cover up, the fabrication evidence and coercion of false out of court statements as well as testimony. The supervisory defendants were aware of their subordinate officers' misconduct in the Camm investigation due in part to their own direct participation in misconduct that violated Mr. Camm's constitutional rights at all stages of the investigation. For example supervisory defendant Niemeyer knew that "expert" Stites was mishandling evidence and in general did not know what he was doing at the time the investigation and failed to stop him.  Niemeyer allegedly reported Stites' incompetence up his chain of command at ISP and ISP supervisor and policy makers did nothing to stop Stites participation in the investigation of these crimes.

218.     Defendants, conspired with each other and concealed evidence of this fabrication and coercion, despite knowing that probable cause did not exist to arrest and prosecute Mr. Camm.

219.     Supervisory defendants reviewed all police reports produced by subordinate officers in the course of the Camm investigation and actively participated in and endorsed the continued investigation and initiation of a prosecution against Mr. Camm, despite their awareness that defendants lacked probable cause to prosecute Mr. Camm, engaged in the improper fabrication, inducement, and coercion detailed above, and participated in and endorsed

48

the continued concealment of material exculpatory and impeachment evidence, including evidence of these tactics.

220.    Defendant Supervisors also affirmatively, and with deliberate indifference, failed to undertake any real reinvestigation of the Camm murders despite the fact that they knew through their direct involvement in every stage of the original investigation and in the suppression of Boney as the true perpetrator, that defendants had suppressed material, exculpatory, and impeachment evidence conclusively demonstrating Mr. Camm's innocence.

**DEFENDANTS' ONGOING UNLAWFUL AND UNCONSTITUTIONAL CONDUCT**

221.    In each and every year since Mr. Camm's wrongful arrest on October 1, 2000, until his October 24, 2013, exoneration and continuing through the present, defendants have breached and continue to breach their legal and constitutional duties to disclose the truth.

222.    Specifically, defendants continue this concealment by still publicly blaming David Camm.

223.    Defendants have violated and continue to violate their clearly established and ongoing legal and constitutional duties and affirmative obligations to come forward in every year after Mr. Camm's arrest, specifically including 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014, which conduct actually and proximately caused Mr. Camm to suffer and endure in each and every one of those years false detention and false imprisonment, deprivation of liberty, humiliation, mental and emotional distress, violations of his constitutional rights, and personal and physical injuries, including but not limited to pain and suffering, severe mental anguish, emotional distress, loss of family relationships, severe psychological damage, loss of educational opportunity, loss of professional opportunity, loss of income, infliction of physical illness, inadequate medical care, humiliation, indignities and

embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, medical care, privacy, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## UNCONSTITUTIONAL POLICIES AND CUSTOMS OF FAITH'S OFFICE, HENDERSON'S OFFICE AND FLOYD COUNTY, INDIANA

224. The investigative lapses which led to Mr. Camm's wrongful arrest, misidentification, malicious prosecution, wrongful conviction and imprisonment were not an anomaly. Rather, the aforementioned tactics were routine in Floyd County; they were simply the way cases were closed in Southern Indiana.

225. Specifically, before, during, and since the unlawful investigation, prosecution, and conviction of David Camm, Faith, K. Henderson, and Floyd County by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by investigators, including but not limited to the following:

    a.      failure to adequately train and hire investigators;

    b.      facilitating and allowing those inadequately trained investigators to collect evidence and conduct critical interviews;

    c.      fabricating evidence;

    d.      failing to promptly document and disclose material, exculpatory and impeachment evidence;

    e.      destroying evidence;

    f.      losing evidence;

g.      failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

h.      disregarding the Fourth Amendment rights of criminal suspects and defendants; and

i.      engaging in the ongoing affirmative concealment and cover up of police and investigatory misconduct.

226.    Before, during and after the unlawful investigation, prosecution, and conviction of David Camm, the defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to the following:

a.      maintaining physical evidence and accurately documenting investigative work;

b.      documenting and promptly disclosing exculpatory and impeachment evidence;

c.      conducting constitutionally adequate investigations with objectivity rather than through tunnel vision; and

d.      providing inducements to convicted felons to lie.

227.    Pursuant to these unconstitutional policies, customs, or patterns and practices, supervisory defendants abdicated and effectively delegated to detectives, and investigators the authority and discretion to conduct and supervise investigations with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects.

228.    As a result, detectives, officers, "experts" and supervisors, routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of

subordinates, in a climate of impunity.

229.    The unconstitutional policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline police and investigators were reflected in the multiple acts of misconduct and illegality committed by multiple police officers, detectives, investigators, "experts" and supervisors in relation to multiple suspects and witnesses in the Camm investigation, as described above.

### *CUSTOM AND PRACTICE OF SUPPRESSING EXCULPATORY AND IMPEACHMENT INFORMATION, AND SYSTEMIC FAILURE TO TRAIN, SUPERVISE & DISCIPLINE INVESTIGATORS IN CARRYING OUT THEIR DUTIES*

230.    In 2000, police and other law enforcement investigators had a clearly established constitutional duty to disclose exculpatory and impeachment information in connection with criminal defendants' constitutional right to a fair trial pursuant to *Brady* v *Maryland, Giglio* v. *United States,* and their progeny. Failing to carry out these *Brady* disclosure duties posed obvious risks for criminal defendants, yet the defendants utterly failed to train in this regard. Specifically, the defendants did nothing to ensure that anyone involved understood their *Brady* duties and carried them out in practice.

231.    As a direct result of the  defendants' deliberate indifference to the obvious risk this endemic *Brady* confusion posed to criminal defendants — and specifically to innocent suspects like David Camm — the confusion persisted throughout the 2000 Camm investigation and indeed for years thereafter without intervention from supervisors or policymakers.

232.    For example, pursuant to this unconstitutional custom and practice of suppressing helpful information and utterly failing to train anyone in their *Brady* and *Giglio* duties, investigators and officers in 2000 arrested, maliciously prosecuted and covered up or withheld exculpatory and impeachment information — including evidence of their own misconduct. —

from innocent suspect, David Camm, who was wrongly convicted twice of murdering his family, which he did not commit and endured more than 13 years of imprisonment before he was proven innocent and released.

*Custom and Practice of Fabricating Inculpatory Evidence and Failure to Supervise and Train*

233.    It is a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence to manufacture probable cause to arrest, detain, or prosecute a suspect violates the suspect's constitutional rights. Nonetheless, the defendants, by and through agents, failed either to supervise their investigators, "experts" or detectives to ensure they did not fabricate evidence, or to discipline them when they did. These failures created an environment of impunity in which fabricating evidence was tacitly authorized.

234.    These systemic lapses and unconstitutional fabrications of evidence were the norm in Southern Indiana in 2000.

## DAMAGES

235.    The actions of the named defendants, individually and collectively, deprived plaintiff David Camm of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the laws of the State of Indiana.

236.    This action seeks damages for the period from September 28, 2000 through each and every year to the present.

237.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused David Camm to be wrongly seized, falsely arrested, indicted without probable cause, maliciously prosecuted, unfairly tried, wrongfully convicted, subjected to illegal searches as well as cruel and unusual punishment

during the course of his 13 years for a crime he did not commit.

238.   The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused David Camm the following injuries and damages, which were foreseeable to the defendants at the time of their acts and omissions, and which continue to date and will continue into the future: pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, medical care, privacy, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

239.   Specifically, and by way of example, Mr. Camm's liberty was curtailed upon his arrest and jailing on October 1, 2000. He remained incarcerated following his arrest until he was exonerated on October 24, 2013, with the exception of a brief period from January 27, 2005 through March 9, 2005.

240.   All of the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, with deliberate indifference, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CONSTITUTIONAL CLAIMS

### COUNT I

## 42 U.S.C. § 1983 CLAIM FOR MALICIOUS PROSECUTION
## IN  VIOLATION OF THE 4th AND 14th AMENDMENTS

241.   Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

242.   Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert as well as  John and Jane Doe officers, and Richard and Roberta Roe supervisors, acting with malice, took steps to initiate and continue the prosecution of Mr. Camm without probable cause or arguable probable cause to believe he was responsible for the murders of Bradley, Jill and Kim Camm.

243.   In furtherance of the malicious prosecution, the named defendants disregarded and dismantled credible alibi evidence, suppressed exculpatory evidence including exculpatory fingerprint and hair exclusions, fabricated evidence, fabricated and pressured inculpatory witness statements, failed to conduct an adequate investigation of the crime by pursuing leads pointing to other leads or suspects, and covered up impeachment evidence of their own misconduct.

244.   The lack of even arguable probable cause was obvious to defendants. Defendants knew that the physical evidence exonerated David Camm. Yet defendants disregarded all the evidence pointing to Mr. Camm's innocence and chose to prosecute him anyway.

245.   The only evidence incriminating Mr. Camm, as defendants knew, had been twisted or manufactured by defendants themselves.

246.   No reasonable police officer or investigator would believe such a fabricated story as the one they help Boney create, much less their own written and oral records about how it was elicited, could provide probable cause or even arguable probable cause to arrest, indict or prosecute.

247.   Likewise, after listening to allegations of Boney (after 6 interviews) no reasonable police officer/investigator could have believed those statements to be reliable or provide probable cause to arrest, indict or prosecute Mr. Camm, when all reliable evidence pointed to his innocence.

248.   Yet, acting with malice, the defendants covered up the truth about their own misconduct — powerful exculpatory and impeachment information — conspired to create a story that involved both Camm and Boney, knowing that the truth would have eviscerated probable cause and to the abandonment of the prosecution of Mr. Camm.

249.   In fact, Mr. Camm was innocent of all crimes charged with on all occasions.

250.   On October 24, 2013, the prosecution terminated in Mr. Camm's favor when his 3rd trial resulted in a NOT GUILTY verdict on all counts.

251.   Defendants' actions to deprive Mr. Camm of his liberty without probable cause were in violation of clearly established constitutional law under the Fourth and Fourteenth Amendments, and no reasonable investigator or police officer in 2000 or after would have believed that their actions were lawful.

252.   Defendants' actions directly and proximately caused Mr. Camm's arrest, indictment, malicious prosecution, unfair trial, wrongful conviction, and deprivation of liberty during his thirteen-year imprisonment, as well as all the ongoing injuries and damages set forth above.

### COUNT II

**42 U.S.C. § 1983 CLAIM FOR DEPRIVATION OF LIBERTY
BY FABRICATING FALSE INCULPATORY EVIDENCE,
WITHOUT DUE PROCESS OF LAW AND DENIAL OF A FAIR TRIAL
WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE,
AND FAILING TO INVESTIGATE, IN VIOLATION OF THE 14TH AMENDMENT OF
THE US CONSTITUTION**

253.     Mr. Camm hereby incorporates and references all of the foregoing paragraphs and further alleges as follows:

*Fabricating Falsely Inculpatory Evidence*

254.     Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert along with John and Jane Doe Police defendants, and Richard and Roberta Roe supervisory defendants, deprived Mr. Camm of liberty without due process of law, and of a fair trial, by deliberately fabricating evidence that was used to arrest, indict, prosecute and convict him.

255.     Specifically, defendants Henderson, Kessinger, Gilbert, Wilkerson and Owen helped manufacture Boney's "confession" which implicated Camm by feeding him non-public facts about the crime which only the perpetrator and police could have known and them misrepresenting those facts to charge Camm and re-indict him for not only the murders of his family members but also conspiracy as to his fictional involvement with Boney.

256.     Defendants repeated the fabrication in their written documentation of the "confession," their selective and egregiously misleading taping of the interrogation, in their notes and police reports, and in pre-testimonial oral reports, as well as in perjurious testimony in court, in pretrial proceedings, and at trial.

257.     No reasonable officer would have believed this conduct was lawful.

258.     Similarly, Defendants Faith, Clemons, Stites, Englert and all supervisory defendants facilitated, acquiesced, and/or fabricated the "expert" opinions of the camera man, Stites, that led to the charges on the probable cause affidavit.

259.     Defendants' fabrications and other dastardly behavior directly and proximately

caused Mr., Camm's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his 13 year imprisonment, as well as all the ongoing injuries and damages set forth above.

*Withholding and Destroying Material Exculpatory and Impeachment Evidence*

260. Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert along with John and Jane Doe Police defendants, and Richard and Roberta Roe supervisor defendants, deliberately, intentionally or recklessly did not document or disclose material exculpatory and impeachment information and provide said information to Camm's attorneys.

261. Furthermore, defendants intentionally or recklessly destroyed material exculpatory and impeachment evidence, including but not limited to:

1. At least two electrostatic lifts of a bare footprint taken by New Albany Police Department Officer Kyle Brewer within hours of the murder in the garage were destroyed;

2. Two condoms, appearing to have been recently added to the Camm septic tank were seized by Floyd County Deputy Coroner Becky Balmer on October 1, 2000 were lost and/or destroyed;

3. A shower curtain in the hallway bathroom of the Camm residence which had a rust-colored stain was lost and/or destroyed;

4. Audio and video records of the gravesite of Kim, Brad and Jill on the February, 2005 day Charles Boney was in the cemetery were allegedly lost;

5. Boney's list of 10 questions he formulated which were given to the original polygraph examiner on February 17-18, 2005 weren't provided and/or lost;

6. GPS records from Boney's car were incomplete; i.e. the last few days prior to his arrest on March 4, 2005 weren't provided and/or lost;

7. The cellular telephone of Kim which was tested for fingerprints was negative after its unauthorized removal by Sgt. Myron Wilkerson from the ISP Evidence Locker;

8.      Two hair follicles with root material found on Kim Camm were lost; and

9.      There are no written records of:

1.  the 33 telephone calls between Boney, Wayne Kessinger and/or Gary Gilbert and others;

2.  the personal contact between Boney, Wayne Kessinger, Keith Henderson and/or others in the Floyd County Prosecutor's office just prior to Boney's arrest;

3.  when Charles Boney was told by Steve Owen that nothing of value was taken from the crime scene;

4.  when Boney told investigators and/or prosecutors of his false alibis;

5.  when Charles Boney was provided the cellular telephone number of WAVE-TV reporter Carrie Harned by Keith Henderson and encouraged to call her; and

6.  other information passed to/from Charles Boney and from/to the investigators and/or prosecutors.

262.    By failing to disclose this information, defendants violated the Fourteenth Amendment, as interpreted by *Brady* v. *Maryland,* 373 U.S. 83 (1963), *Giglio* v. *United Scales,* 405 U,S. 150 (1972), *California* v. *Trombetra,* 467 U.S. 479 {1984}, *Arizona* v. *Youngblood,* 488 U.S. 51 (1988), and their pre-1993 progeny, which imposed a clear constitutional duty on the defendants not to conceal, suppress or destroy obviously exculpatory evidence, and rather to document and report exculpatory and impeachment information.

263.    The exculpatory and impeachment information defendants concealed, suppressed and destroyed in this case was material, and undermined confidence in the outcome of the trial.

264.    Defendants' deliberate and intentional concealment, suppression and destruction of exculpatory and impeachment information directly and proximately caused Mr. Camm's unfair trials, wrongful convictions, and deprivation of liberty without due process of law during his thirteen year imprisonment, as well as all the ongoing injuries and damages set forth above.

*Failure to Investigate*

265.    Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson,

Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert along with John and Jane Doe Police defendants, and Richard and Roberta Roe supervisor defendants, further violated Mr. Camm's Fourteenth Amendment rights by intentionally, recklessly and with deliberate indifference failing to conduct a constitutionally adequate investigation of the crime to seek out the true perpetrator, to wit, by:

a.      failing to send evidence to the lab before charges were filed;

b.      failing to direct the crime lab to compare the fingerprints from Bronco with indexed fingerprints in the custody of the ISP and Floyd County that shared similar features with the latent prints and belonged to individuals who were known to frequent the area of the Camm murders and/or who had been linked to similar crimes previously;

c.      intentionally not interviewing alibi witnesses who tended to disprove Mr., Camm's guilt and prove his innocence;

d.      failing to follow up on exculpatory and potentially exculpatory information provided by witnesses who were interviewed in connection with the Camm murders,

e.      refusing to run Boney's DNA through the CODIS system;

f.      failing to pursue evidence and leads concerning other suspects after their theory of Mr. Camm's guilt had been fatally undermined by known exculpatory evidence,

g.      failing to conduct a thorough neighborhood investigation;

h.      failing to attempt to identify the driver of a vehicle matching the description of Boney's vehicle which was in the Camm neighborhood on the afternoon of the murders;

i.      failing to check available public and law enforcement databases for leads to help identity the true killer;

j.      losing and/or destroying the evidence outlined in the preceding paragraphs of this

complaint; and

k.      instead, coercing, fabricating and manufacturing evidence of Mr. Camm's guilt by means of covering up exculpatory witness statements, using undue suggestion to induce Boney to identify him as a participant in Boney's crimes.

266.    Defendants' acts and omissions in failing to conduct investigation seeking to determine the truth about and murders of the Camm family violated Mr. Camm's clearly established rights under the procedural due process component of the Fourteenth Amendment, including his right to a fair trial and caused his wrongful conviction and the injuries and damages set forth above.

267.    No reasonable "expert," investigator or police officer in 2000 or after would have believed that defendants' acts and omissions in this case — fabricating evidence, coercing false inculpatory statements, failing to document and disclose material, exculpatory evidence, and failing to investigate exculpatory evidence or leads pointing toward other more viable suspects — were lawful.

268.    Defendants' intentional, reckless or deliberately indifferent acts and omissions in failing to conduct a constitutionally adequate investigation directly and proximately caused Mr. Camm's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his thirteen year imprisonment, as well as all the ongoing injuries and damages set forth above.

## COUNT III

**42  U.S.C.  § 1983 CLAIM FOR ENGAGING IN CONDUCT
THAT SHOCKS THE CONSCIENCE
IN  VIOLATION OF THE 14th AMENDMENT'S
GUARANTEE OF SUBSTANTIVE DUE PROCESS OF LAW**

269.     Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

270.     In Defendant Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert's collective drive to secure Mr. Camm's wrongful conviction, defendants along with  John and Jane Doe officers, and Richard and Roberta Roe supervisors deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated David Camm's substantive due process rights under the Fourteenth Amendment.

271.     Specifically, as set forth above, the defendants engaged in coercion with witnesses, used undue suggestion with witnesses in hopes of inducing them to identify Mr. Camm, fabricated Boney's "story" and other witness statements, concealed and destroyed evidence that was favorable to the defense, covered up their own misconduct, and refused to pursue leads implicating other suspects, all in a concerted effort to justify Mr. Camm's arrest, prosecution and conviction although every shred of reliable evidence demonstrated his innocence.

272.     The defendants' conduct shocks the conscience, and violated Mr. Camm's clearly established constitutional right to substantive due process of law, as guaranteed by the Fourteenth Amendment. No reasonable investigator and or police officer in 2000 or since would believe the defendants' conduct was lawful.

273.     Defendants' conscience-shocking conduct directly and proximately caused Mr., Camm's arrest, malicious prosecution, unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his 13-year imprisonment, as well as all the ongoing

injuries and damages set forth above.

## COUNT IV

### 42  U.S.C. § 1983 CLAIM FOR SUPERVISORY LIABILITY
### AGAINST NAMED AND  UNNAMED  SUPERVISORS

274.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

275.    Defendants Faith, Henderson, Owen, Sarkisian, Walls, Neal, Biddle, Hickerson, and Englert, Unnamed Defendants Richard and Roberta Roe supervisors ("supervisory defendants"), were, at the relevant times, supervisory personnel with (or acting for) Floyd County and/or ISP with oversight responsibility for, and personal involvement in, the training, hiring, screening, instruction, supervision and discipline of investigator and police defendants. Said failure to train and/or supervise the investigators and police defendants directly led to the violation of Mr. Camm's rights.

276.    The supervisory defendants knew or should have known that their subordinate officers and/or investigators were maliciously prosecuting civilians, failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, fabricating and pressuring inculpatory witness statements, suppressing and destroying exculpatory evidence, and depriving civilians of due process of law, and authorized, approved, encouraged, and/or directly participated in all of these unconstitutional practices.

277.    The supervisory defendants knew that in a continuation of their subordinate officers' known pattern of misconduct, defendants and John and Jane Doe officers had deprived Mr. Camm of his clearly established Constitutional rights through misconduct that included but was not limited to coercing and fabricating confessions, pressuring and fabricating witness statements and other evidence, destroying evidence, concealing material, exculpatory and

impeachment evidence, failing to conduct a constitutionally adequate investigation into the Camm murders, including failing to investigate leads likely to lead to the true perpetrator or definitively exonerate Mr. Camm, and violating their ongoing affirmative obligation to come forward with the truth of their own misconduct and evidence of Mr. Camm's innocence, and yet authorized, approved, encouraged, or directly participated in these violations of Mr. Camm's constitutional rights.

278.    The supervisory defendants, by deliberately, recklessly, and with gross negligence failing to supervise their subordinate investigators or police officers and authorizing, approving, facilitating, or directly participating in their subordinates' misconduct, despite their subordinates' known pattern of such misconduct, caused their subordinates to deprive Mr. Camm of his clearly established constitutional rights, including but not limited to his rights not to be deprived of liberty without due process of law, to a fair trial, not to be compelled to be a witness against himself, and right of access to the courts.

279.    Moreover, the defendants acted with impunity in an environment in which they were not supervised, or disciplined by the supervisory defendants, and Richard and Roberta Roe supervisors, and in which they knew that their violations of Mr. Camm's constitutional rights would be encouraged, authorized, approved, and/or facilitated by the defendant supervisors.

280.    The deliberately indifferent, reckless, and grossly negligent conduct of the supervisory defendants violated their clearly established duty, in 2000 and after, to supervise subordinate detectives, including but not limited to defendant investigators and police officers, and no reasonable police supervisor in 2000 or since would have believed that deliberately indifferent, reckless, and grossly negligent supervision in the face of notice of misconduct by their subordinate officers, much less the supervisory defendants' ratification of and personal

participation in it, was lawful.

281.    The supervisory defendants' actions and omissions proximately and directly caused Mr. Camm's arrest, malicious prosecution, unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his thirteen-year imprisonment, as well as all the ongoing injuries and damages set forth above.

**COUNT V**

**42 U.S.C. § 1983  CIVIL RIGHTS CONSPIRACY CLAIM
AGAINST ALL NAMED AND UNNAMED
INDIVIDUAL DEFENDANTS**

282.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

283.    Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert along with John and Jane Doe officers, and Richard and Roberta Roe supervisors agreed among themselves and with other individuals, officers and supervisors, and others both within and outside Stan Faith's office, Keith Henderson's office, Floyd County, Indiana and the ISP, to act in concert in order to deprive Mr. Camm of his clearly established Fourth and Fourteenth Amendment rights not to be deprived of his liberty without due process of law, to a fair criminal trial, not to be compelled to be a witness against himself, and to access to the courts.

284.    In furtherance of the conspiracy to violate Mr. Camm's civil rights, defendants and others agreed, engaged in and acted in concert to facilitate and carry out numerous overt acts, including, without limitation, the following:

a.       intentionally concealing or destroying material, exculpatory, and impeachment

evidence, including but not limited to defendants' coercion, improper inducement, and fabrication of Mr. Boney's "confession" and witness statements; their use of improperly suggestive identification techniques; the existence of witness statements exculpating Mr. Camm and pointing to the true perpetrator; and other evidence tending to establish Mr. Camm's innocence;

b.       employing coercion, including physical threats, trickery, deceptive promises, and other means deliberately designed to frame David Camm of crimes he did not commit;

c.       Providing Charles Boney non-public facts to help coerce his story and implication of David Camm in the murders that Boney committed when in fact those facts originated with police during the six "interviews" they had with Boney;

d.       creating false police reports, reposing false facts to the court, and otherwise fabricating and misrepresenting evidence so as to falsely inculpate Mr. Camm and to conceal defendants' investigative misconduct;

e.       deliberately providing perjured testimony in Mr. Camm's criminal trials;

f.       before and after Mr. Camm's arrest, charging for the crimes, and continuing after his conviction, deliberately choosing not to investigate leads pointing to other suspects and corroborating Mr. Camm's innocence;

g.       covering up and refusing to disclose or investigate the handprint and DNA evidence linking Boney to the crime that was ever present at the crime scene; and

h.       throughout Mr. Camm's thirteen year wrongful imprisonment, through his exoneration on October 24, 2013 and through the present, defendants continuing to conceal their misconduct.

285.    Defendants' conspiracy, and overt acts in furtherance thereof, proximately and

directly caused Mr. Camm's arrest, malicious prosecution, unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his thirteen-year imprisonment, as well as all the ongoing injuries and damages set forth above.

### COUNT VI

**42  U.S.C. 1983  *MONELL*  CLAIM
AGAINST FLOYD COUNTY FOR
UNCONSTITUTIONAL CUSTOMS AND
PERVASIVE FAILURES TO TRAIN, SUPERVISE AND DISCIPLINE**

286.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs, in particular paragraphs 228 through 255, and further alleges as follows.

287.    Before, during, and since the unlawful investigation, prosecution, and conviction of David Camm, municipal defendant Floyd County, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by Floyd County investigators.

288.    Before, during and after the unlawful investigation, prosecution, and conviction of David Camm, the municipal defendant Floyd County, by and through it's final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline investigators and police officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects.

289.    Pursuant to these unconstitutional policies, customs, or patterns and practices, municipal defendants' final policymakers abdicated and effectively delegated to prosecutors acting as investigators along with other untrained investigators and detectives, including but not limited to defendants Faith, K. Henderson, Owen, Stites, Englert, M. Henderson, Vaught, Toran, Fessel Miller, Kessinger, the authority and discretion to conduct and supervise investigations

with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects.

290.    As a result defendants routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

291.    The unconstitutional municipal policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline were reflected in the multiple acts of misconduct and illegality committed by multiple investigators and police officers, detectives and supervisors in relation to multiple suspects and witnesses in the Camm investigation, as described above.

292.    The municipal defendants' unconstitutional policies, customs, or patterns and practices of investigative misconduct and failure to supervise and train detectives and officers were also reflected in numerous prior cases and investigations involving defendant officers and other employees which, upon information and belief, were known to the municipal defendants and their final policymakers before the Camm murder investigation.

293.    The misconduct and constitutional violations committed by the individual investigators and police defendants, known and unknown, in the course of the investigation and prosecution of David Camm were carried out pursuant to the municipal defendants' policies, customs, or patterns and practices of promoting, facilitating, or condoning  improper, illegal, and unconstitutional investigative techniques, and their policy, custom, or pattern and practice of failing to train and supervise employee officers, detectives, and supervisors.

294.    Upon information and be1ief, municipal defendants, acting with deliberate indifference, maintained this policy, custom, or pattern and practice of investigative misconduct

and policy of failing to train, supervise, discipline, or otherwise remediate investigators and police officers, despite their notice of ongoing lapses of constitutional magnitude and the known or obvious risk that these policies would result in violations of the constitutional rights of criminal suspects like Mr. Camm.

295.    These municipal defendants' policies, customs, or patterns and practices were the moving force in the violation of David Camm's constitutional rights, directly resulting in his malicious prosecution, unfair trial, unjust conviction and thirteen year imprisonment, as well as the other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL INDIVIDUAL DEFENDANTS

296.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

297.    Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert along with John and Jane Doe officers, and Richard and Roberta Roe supervisors, intentionally and/or recklessly, directly and proximately caused Mr. Camm, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Camm by a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, and e) maliciously prosecuting Mr. Camm and causing Mr. Camm's false arrest and imprisonment.

298.    The defendants' actions caused Mr. Camm to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and

duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

299.    The defendants' actions caused Mr. Camm to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued affects of post-traumatic stress disorder.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST ALL DEFENDANTS

300.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

301.    Defendants Faith, Clemons, Sarkisian, Niemeyer, Walls, Neal, Biddle, Hickerson, Wilkerson, Gilbert, Vaught, Toran, M. Henderson, Fessel Miller, K. Henderson, Kessinger, Owen, Stites, and Englert, along with John and Jane Doe officers, and Richard and Roberta Roe supervisors, directly, proximately, and with negligence and/or gross negligence, caused Mr., Camm, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Camm to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, and e) maliciously prosecuting Mr. Camm and causing Mr. Camm's false arrest and imprisonment, directly and proximately caused Mr. Camm, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned.

302.    The defendants' actions caused Mr. Camm to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction

incarceration.

303.    The defendants' actions caused Mr. Camm to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued affects of post-traumatic stress disorder.

## COUNT IX

## NEGLIGENT SUPERVISION

304.    Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

305.    The municipal defendants, as well as Supervisory Defendants and Richard and Roberta Roe supervisors (the "supervisory defendants" ) had a duty to properly train and supervise investigator, officer, detective, and supervisor employees of the Floyd County and/or ISP and to provide adequate policies to prevent the above conduct, including fabricating evidence, destroying evidence, coercing and fabricating confessions and witness statements, and concealing material, exculpatory and impeachment evidence.

306.    Nonetheless, the municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the non-supervisory defendants, as well as unknown officers with the Floyd County.

307.    Defendants as well as unknown officers with the Floyd County and/or ISP committed negligent and intentional acts that resulted in the arrest and imprisonment of Mr. Camm for murder, without probable cause or other legal justification, knowing that there was no physical or testimonial evidence connecting Mr. Camm to the crime, and also fabricated statements including admissions that they attributed conduct to Mr. Camm in police reports and

in testimony, pretrial and at trial, concerning the precise details of the crime, and where in fact Mr. Camm was innocent of any crime,

308.   Municipal defendants and the supervisory defendants knew of or had reason to know of the risks that non-supervisory defendants, as well as unknown officers with Floyd County and ISP would commit negligent and intentional acts that resulted in the wrongful arrest and imprisonment of citizens such as Mr. Camm.

309.   As a direct and proximate result of this negligent training, supervision, and adoption of policies, Mr. Camm was wrongly arrested, prosecuted, convicted, and imprisoned, and sustained the injuries and damages set forth in this Complaint.

## COUNT X

### RESPONDEAT SUPERIOR

310.   Mr. Camm hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

311.   At all times relevant to this Complaint, Defendants along with John and Jane Doe officers, and Richard and Roberta Roe supervisors acted as agents of, and in the scope of their employment. The conduct by which the defendants committed the torts of malicious prosecution, false arrest and imprisonment, intentional or reckless infliction of emotional distress and negligent infliction of emotional distress was undertaken while the defendants were carrying out their routine investigative functions as investigators and police officers, while defendants were subject to their employer's control and engaging in such conduct as would have been reasonably expected, and was in fact foreseen, by their employer. In undertaking this conduct, defendants intended to further the law enforcement goals of Floyd County and the Indiana State Police.

312.   Floyd County, the Indiana State Police, and Englert Forensic Consultants, LLC,

are liable for all damages caused by its agents' actions leading to Camm's malicious prosecution, and intentional, reckless or negligent infliction of emotional distress under the doctrine of *respondeat superior.*

**WHEREFORE**, Plaintiff, David Camm, prays as follows;

A.     That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to him, and against all *individual defendants,* in an amount, to be determined at trial, that will deter such conduct by defendants in the future;

C.      For a trial by jury;

D.     For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims and costs pursuant to 42 U.S.C. § 1920; and,

E.     For any and all other relief to which he may be entitled,

Respectfully submitted,


/s/GARRY R. ADAMS
GARRY R. ADAMS
THOMAS E. CLAY
DANIEL J. CANON
CLAY DANIEL WALTON & ADAMS, PLC
101 Meidinger Tower
462 S. Fourth Street
Louisville, KY  40202
(502) 561-2005

## <u>VERIFICATION</u>

I, David Camm, state that I have read the foregoing Complaint and the statements contained therein are true to the best of my knowledge and belief.

_____
DAVID CAMM

Subscribed and sworn to before me by David Camm on this the _____ day of October, 2014.

My commission expires: _____.

_____
NOTARY PUBLIC
KENTUCKY STATE AT LARGE
_____COUNTY