# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| DAVID R. CAMM,        ) | |
| ) | |
|          Plaintiff,     ) | |
| ) | |
|          v.          ) | Case No. 4:14-cv-00123-TWP-DML |
| ) | |
| STANLEY O. FAITH, SEAN CLEMONS, ) | |
| SAM SARKISIAN, JAMES NIEMEYER, ) | |
| WILLIAM L. WALLS, ROBERT NEAL, ) | |
| JAMES BIDDLE, JAMES HICKERSON, ) | |
| MYRON WILKERSON, GARY GILBERT, ) | |
| KEITH HENDERSON, STEVE OWEN, ) | |
| ROBERT STITES, RODNEY ENGLERT, ) | |
| ENGLERT FORENSIC CONSULTANTS, ) | |
| LLC, UNKNOWN JOHN DOE AND JANE ) | |
| DOE OFFICERS, and UNKNOWN ) | |
| RICHARD AND ROBERTA ROE ) | |
| SUPERVISORS, ) | |
| ) | |
|          Defendants.    ) | |

## ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on six Motions for Summary Judgment filed by the Defendants in this action. (Filing No. 148; Filing No. 150; Filing No. 152; Filing No. 154; Filing No. 157; Filing No. 160.) Following three jury trials for the murder of his wife and two children, which ultimately resulted in his acquittal and freedom, Plaintiff David R. Camm ("Camm") filed this action for malicious prosecution, due process violations, conspiracy to violate civil rights, a *Monell* claim, and state law claims against the prosecutors who filed the charges and some of the law enforcement officers and investigators who investigated the crime.

Defendants Sean Clemons ("Clemons"), Sam Sarkisian ("Sarkisian"), James Niemeyer ("Niemeyer"), William L. Walls ("Walls"), Robert Neal ("Neal"), and James Biddle ("Biddle") (collectively, the "First Investigators") are Indiana State Police officers and investigators. They

assert that they are entitled to summary judgment because probable cause existed to charge Camm with murder and because they are immune from liability under the Indiana Tort Claims Act, Indiana Code § 34-13-3-1 *et seq*. ("ITCA"), and the qualified immunity doctrine. ([Filing No. 149](#).) Defendant Gary Gilbert ("Gilbert"), the lead case officer for Camm's second trial, asserts that he is entitled to summary judgment because he is immune from liability based on qualified immunity and the ITCA and also because probable cause existed to charge Camm with murder a second time. ([Filing No. 153](#).) Defendant Stanley O. Faith ("Faith") was the Floyd County, Indiana Prosecutor for Camm's first trial and Defendant Keith Henderson ("Henderson") was the Floyd County Prosecutor for Camm's second trial. Each respectively contend that they should be awarded summary judgment because their prosecutions of Camm were supported by probable cause, and they are entitled to absolute prosecutorial immunity and ITCA immunity for their actions as county prosecutors. ([Filing No. 151](#); [Filing No. 155](#).)

Defendant Rodney Englert ("Englert"), owner and operator of Englert Forensic Consultants, LLC ("Englert Forensic") (collectively, the "Englert Defendants") and Defendant Robert Stites ("Stites") are forensic consultants. They each move for summary judgment arguing that there is insufficient evidence to support any of Camm's federal or Indiana state law claims against them as private consultants and that they are immune from liability as investigators and witnesses. ([Filing No. 158](#); [Filing No. 161](#).)

Camm submitted a Consolidated Response in opposition to the Defendants' Motions for Summary Judgment (the "Response"). ([Filing No. 184](#).) The State Defendants collectively filed a Consolidated Reply ([Filing No. 206](#)) and Stites and the Englert Defendants filed their individual Replies. ([Filing No. 200](#) and [Filing No. 199](#).) Thereafter, Camm filed a Surreply ([Filing No. 207](#)). For the following reasons, the Court **GRANTS** the Defendants' Motions for Summary Judgment.

# I.  BACKGROUND

As required by Federal Rule of Civil Procedure 56, the following facts are presented in the light most favorable to Camm as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *see also*, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

Camm became a Trooper for the Indiana State Police in 1989 and later retired as a Senior Trooper in the spring of 2000.  (Filing No. 156-1 at 29-31.)  On the evening of September 28, 2000, Camm left his home to play basketball at a nearby church.  (Filing No. 156-1 at 223-28.) He arrived at the church gym between 6:50 p.m. and 7:00 p.m., and the basketball games began at approximately 7:15 p.m.  (Filing No. 156-1 at 228.)  A total of eleven basketball players, including Camm, played about five or six games with each game lasting approximately twenty minutes. (Filing No. 156-1 at 226-28.)  Due to uneven numbers, Camm sat out for certain portions of the games.  (Filing No. 156-1 at 226.)  Camm and the other basketball players left the gym at approximately 9:22 p.m., and he returned home.  (Filing No. 156-1 at 237.)

When Camm arrived home, he discovered his wife, Kimberly Camm ("Kimberly"), and his children, Jill Camm ("Jill") and Bradley Camm ("Bradley"), dead in their garage.  (Filing No. 156-1 at 97-99.)  Camm first saw Kimberly lying on the garage floor and ran to check on her. (Filing No. 156-1 at 98.)  He knelt down beside Kimberly in a pool of blood to find that she was unresponsive.  (Filing No. 156-1 at 98.)  Camm then began to look for his children and saw Bradley in the back seat of their Ford Bronco in the garage.  (Filing No. 156-1 at 98.)  He reached into the vehicle to grab Bradley and found Jill sitting next to him.  (Filing No. 156-1 at 98-99.)  Camm pulled Bradley out of the vehicle, laid him on the garage floor, and began giving him CPR.  (Filing No. 156-1 at 99.)  After attempting to resuscitate Bradley without success, Camm called the

Indiana State Police for help and ran to his grandfather's house nearby. (Filing No. 156-1 at 99-100.)

A.    **First Investigation**

Several Indiana State Police officers and investigators arrived at the Camm's home to investigate the murders. Clemons and Neal were among the first investigators to arrive at the crime scene. (Filing No. 156-3 at 17-19; Filing No. 156-7 at 10-12.) Upon his arrival, Clemons assumed responsibility as the lead investigator and was later assigned as such by his Lieutenant, Jim Biddle. (Filing No. 156-3 at 28.) As the lead investigator, Clemons oversaw the murder investigation and was notified of all evidence being collected. (Filing No. 156-3 at 56.) Faith, the Floyd County Prosecutor at that time, also arrived to observe the crime scene and advise the police on the night of the murders. (Filing No. 156-3 at 42; Filing No. 156-8 at 19.) Faith directed Clemons to conduct certain interviews, follow up on bank and telephone records, and other general investigatory tactics. (Filing No. 156-3 at 44-45.) Faith also directed investigators from the prosecutor's office to instruct officers on what to collect and what to dust for prints and made final decisions such as who would be the supervising technician over the scene. (Filing No. 156-6 at 31-35.) At one point, officers were told to stop complaining and start collecting certain evidence "because Stan Faith said this." *Id.* However, Faith did not direct Clemons on any specific evidence that should be collected and did not demand control of the investigation from Clemons. (Filing No. 156-3 at 44-45.)

Sarkisian, a crime scene technician, and his supervisor, Niemeyer, also arrived at the scene shortly after Camm's call. (Filing No. 156-5 at 10, 13; Filing No. 156-6 at 13-14.) Sarkisian arrived at the crime scene between 9:45 p.m. and 10:00 p.m. on September 28, 2000, and Niemeyer arrived at the scene shortly thereafter. (Filing No. 156-5 at 13, 18.) While at the scene, Sarkisian

took directives only from Niemeyer. (Filing No. 156-5 at 25.) Sarkisian helped to process the crime scene by taping off the scene, taking photographs, documenting evidence, monitoring the area around the Camm home, and looking for signs of forced entry or evidence of a weapon. (Filing No. 156-5 at 16-20.) Sarkisian took photographs of a half bloody footprint inside the garage, but it was unclear whether the footprint was evidence from the murders or was made by the troopers investigating the scene. (Filing No. 156-5 at 26-27; Filing No. 156-6 at 82.) Sarkisian also found a gray sweatshirt underneath Bradley's body but did not thoroughly examine it at that time. (Filing No. 156-5 at 87-89.) Niemeyer videotaped the scene, including the outside of the garage door, the back of the Bronco, Bradley and Kimberly laying on the garage floor, a shell casing on the garage floor, and possibly the driver's side of the Bronco. (Filing No. 156-5 at 20; Filing No. 156-6 at 104.) Investigators from the prosecutor's office attempted to direct Niemeyer to collect evidence based on Faith's instructions, but Niemeyer took orders from his supervisor, Joe Vetter. (Filing No. 156-6 at 34-35.)

On the night of the murders, Clemons informed Camm that he was a suspect and, being that it was his family that was murdered, Camm was not surprised. (Filing No. 156-1 at 40-42.) Clemons interviewed Camm's aunt and neighbor, Mrs. Ter Vree, who reported hearing three short, crisp banging sounds around 9:00 p.m. that evening. (Filing No. 156-3 at 36-37.) Based on Mrs. Ter Vree's statement, Clemons believed that the murders took place after 9:00 p.m. (Filing No. 156-3 at 36.) Clemons was made aware of a sweatshirt found at the scene and a palm print found on Camm's Bronco but believed that neither provided sufficient evidence to produce an identification. (Filing No. 156-3 at 68-69, 128.) The sweatshirt also appeared to have writing on the collar that looked to say "Backbone" or "Rack One." (Filing No. 156-3 at 65-66.)

The next day, September 29, 2000, Faith told Clemons that he planned to bring in a crime scene reconstruction expert to evaluate the crime scene. Faith called Englert and asked him to come analyze the scene in New Albany as soon as possible. (Filing No. 156-3 at 101; Filing No. 156-8 at 30-31.) Englert informed Faith that he had a prior engagement and would not be able to come to the crime scene personally. (Filing No. 156-8 at 36.) However, Englert indicated that he would send his assistant, Stites, to the crime scene in his place, and Stites would be able to take measurements and photographs and to generally survey the scene. (Filing No. 156-8 at 37; Filing No. 156-8 at 37.) Based on Englert's representations, Faith did not believe that Stites had the authority to make any final opinions or determinations regarding the crime scene and did not further inquire into Stites' credentials. (Filing No. 156-8 at 39, 42.)

When Stites arrived at the crime scene on September 30, Clemons believed he was the crime scene reconstruction expert Faith had referenced. (Filing No. 156-3 at 101.) Stites took hundreds of photographs, wrote detailed notes, conducted presumptive blood tests, and otherwise generally examined the crime scene to collect evidence. (Filing No. 159-2 at 13-15; Filing No. 162-7 at 11-15.) Stites instructed the Indiana State Police investigators to collect evidence from the garage door and a shower curtain in Camm's bathroom for possible traces of blood. (Filing No. 159-2 at 15.) Upon examination of Camm's clothing from the night of the murders, Stites showed Clemons and Neal what he believed to be high velocity impact blood spatter ("HVIS") on Camm's t-shirt, meaning that Camm would have had to be in close vicinity to the victims when they were shot. (Filing No. 156-3 at 102.) Stites telephoned Englert, who agreed that HVIS was present on Camm's shirt based on Stites' description over the telephone. (Filing No. 159-2 at 15-16.) In addition to the HVIS evidence found on Camm's shirt, Stites reported that a bleach-like residue had been thrown from the back deck of the Camm home and left a trail from the house,

indicating that someone had attempted to clean a trail of blood. ([Filing No. 156-3 at 154-55](#); [Filing No. 159-2 at 10](#).) Stites had no formal training as a crime scene reconstructionist. ([Filing No. 159-2 at 10](#).) He was being trained by Englert and believed that everything he tested would be subject to further testing to confirm his findings. *Id.*

Faith drafted the first probable cause affidavit against Camm and filed it with the Floyd County Court on October 1, 2000 (the "First Probable Cause Affidavit"). ([Filing No. 156-4](#).) The First Probable Cause Affidavit stated that HVIS was found on Camm's shirt and that cleaning supplies were used to manipulate the crime scene based on the evidence provided by Stites and Englert. ([Filing No. 156-4 at 1-2](#).) Clemons reported that Mrs. Ter Vree reported hearing three banging sounds "that can be interpreted as gunshots" between 9:15 p.m. and 9:30 p.m. on the night of the murders after Camm had returned home from playing basketball. ([Filing No. 156-4 at 2](#).)[1] The First Probable Cause Affidavit further indicated that Kimberly and Jill were killed by .380 caliber gunshots to the head while Bradley was killed by a gunshot to his chest. ([Filing No. 156-4 at 2](#).) Additionally, the First Probable Cause Affidavit noted that Jill's body showed signs of molestation. ([Filing No. 156-4 at 2](#).) The First Probable Cause Affidavit was signed by both Faith and Clemons. ([Filing No. 156-4 at 3](#).) Based on the evidence provided in the First Probable Cause Affidavit, Floyd County Judge Richard Striegel determined that probable cause existed, which led to Camm's arrest. ([Filing No. 156-4 at 3](#).)

**B.    First Criminal Trial**

Upon this judicial finding of probable cause, Faith led the prosecution against Camm. ([Filing No. 156-8 at 7](#).) In preparation for trial, Faith consulted with five different individuals whom he considered to be blood spatter experts regarding the HVIS evidence found on Camm's

---

[1] Mrs. Ter Vree testified at the first trial that the bangs did not sound like gunshots and denied that she ever told Detective Clemons that they sounded like gunshots. ([Filing No. 184-8 at 2-3](#)).

shirt. This included Indiana State Police crime scene experts Tom Bevel ("Bevel") and Dean Marks ("Marks"), as well as Englert and Stites. ([Filing No. 156-8 at 93-100](#).)  Faith hoped to identify the owner of the sweatshirt that was found at the crime scene through a DNA evaluation. ([Filing No. 184-15 at 7-8](#).)  Indiana State Police DNA analyst, Lynn Scamahorn ("Scamahorn"), took several random samplings of the sweatshirt and determined that it contained DNA from two different people, at least one of which was female, but she did not find unknown male DNA on it. ([Filing No. 156-8 at 203-05](#); [Filing No. 184-15 at 8](#).)  Faith specifically asked Scamahorn if she could testify that Camm's DNA was found on the sweatshirt, but Scamahorn stated that she could not provide such testimony. ([Filing No. 184-17 at 3-4](#).) Faith threatened Scamahorn with obstruction of justice if she did not testify that Camm's DNA was on the sweatshirt.[2] ([Filing No. 156-8 at 177-79](#).)

In September 2001, Camm's defense attorney, Michael McDaniel ("McDaniel"), had the sweatshirt tested by scientists from Minnesota who were able to develop a DNA profile for an unknown male from the sweatshirt's collar. ([Filing No. 184-15 at 8-11](#).)  McDaniel called Faith to ask if he could recover a DNA identification by running the unknown DNA recovered from the sweatshirt through the Indiana State Police's CODIS DNA identification system. ([Filing No. 156-8 at 190-91](#); [Filing No. 184-15 at 11](#).)  Faith instructed Clemons to run a DNA profile through CODIS. Faith concedes that he did not communicate properly with Clemons regarding which DNA profile to run in CODIS, and the unknown male DNA recovered from the sweatshirt was not run in CODIS prior to the first trial. ([Filing No. 184-14 at 4](#).) Faith responded to McDaniel that he was unable to obtain an identification through CODIS. ([Filing No. 156-8 at 191](#).)

---

[2] Faith disputes this allegation. ([Filing No. 156-8 at 177-79](#).)

Camm's first trial began on January 7, 2002. *Camm v. Indiana*, 812 N.E.2d 1127, 1130 (Ind. Ct. App. 2004) ("*Camm I*"). During the first trial, Faith brought in evidence of several extramarital affairs Camm had sustained and called Englert and Marks as expert witnesses to discuss the presence of HVIS evidence on Camm's clothing. ([Filing No. 156-8 at 161-71](#).) Faith also utilized Stites as a fact witness for the first trial. ([Filing No. 156-8 at 171](#)). Despite having only a Bachelor's degree in Economics ([Filing No. 184-5 at 3](#)), Stites testified at Camm's first trial that he was a crime scene reconstructionist and a professor at Portland State University, teaching graduate classes in blood spatter analysis, crime scene reconstruction, and evidence extraction. ([Filing No. 184-19 at 3](#).) Stites further testified falsely that he was working toward a Masters and PhD in fluid dynamics at that time and that he had taken physics and other hard sciences. ([Filing No. 184-19 at 3](#).) McDaniel strategically allowed Stites to testify without moving to disqualify him because he believed Stites to be an "absolute idiot" and that the jury would not find him credible. ([Filing No. 159-17 at 3](#).) In addition, McDaniel challenged the purported HVIS evidence with his own forensic expert.

Camm was convicted of murdering Kimberly, Jill, and Bradley on March 17, 2002. *Camm I*, 812 N.E.2d at 1130. However, the Indiana Court of Appeals reversed the conviction on August 10, 2004. *See generally*, *id*. at 1127. In reversing his conviction, the Indiana Court of Appeals held that evidence of Camm's extramarital affairs was inappropriate to prove Camm was guilty of murdering his wife and children because it was not accompanied by any evidence establishing a violent or hostile relationship between Camm and Kimberly. *Id*. at 1133. The Indiana Court of Appeals noted "[b]ecause Camm does not assert that the evidence was insufficient to support his convictions, he may be retried. See *Goble v. State* 766 N.E. 2d 1,7 (Ind.Ct.App. 2002)" Id. at 1138.

The Indiana Court of Appeals further cautioned, for purposes of guidance on retrial, that evidence that Jill was molested also could be considered unduly prejudicial against Camm. *Id.* at 1140.

**C.**     <u>**Second Investigation**</u>

After Camm's first conviction was reversed, Gilbert, a detective with the Indiana State Police was assigned as the new lead investigator for the Camm murders on September 3, 2004, by Captain Dale Mullikin. (Filing No. 156-10 at 29-30.) Captain Mullikin assigned investigator Mike Black ("Black") to assist Gilbert with the investigation. (Filing No. 156-10 at 29-30.) Within days of being assigned the case, Gilbert met with Black, new Floyd County Prosecutor Henderson, Clemons, and Sarkisian regarding evidence previously collected and the new investigation. (Filing No. 156-10 at 30-31.) Henderson told Gilbert that he wanted "someone not associated with the initial investigation" on the new investigation and wanted him to explore any possible new avenues that may be available involving witnesses, evidence, and laboratory analyses. (Filing No. 156-10 at 30-33.) Henderson believed the first probable cause affidavit contained incorrect information regarding the time that the crime had occurred and the reference to cleaning agents. Henderson discovered that there were several boxes that "Faith had never done anything with," and he directed officers to take the contents to the lab. (Filing No. 184-11 at 11.) Based on Henderson's direction, it was discovered that there was a DNA profile that had not been run through CODIS. (Filing No. 184-11 at 12.) Henderson also traveled to the prison in Michigan City to participate in an interview with a jailhouse informant. *Id.* at 10

In addition to reviewing the records collected from the prior investigation (Filing No. 156-10 at 33-35), Gilbert conducted several interviews, including with Faith, Camm's first wife, and Camm's daughter. (Filing No. 156-10 at 62-74.) Based on the information Gilbert had gathered, Henderson filed a second probable cause affidavit against Camm, signed by Gilbert on November

16, 2004 (the "Second Probable Cause Affidavit"). (Filing No. 156-12.) The Second Probable Cause Affidavit indicated that Jill's body showed signs of molestation and that the bed cover in the Camm's master bedroom contained bodily fluids from both Camm and Jill. (Filing No. 156-12 at 1.) Similar to the First Probable Cause Affidavit, the Second Probable Cause Affidavit also noted that "high impact force spatter" was found on the shirt Camm was wearing on the night of the murders. (Filing No. 156-12 at 2.) It further stated that while Camm was subject to standard evidence collection procedures at Floyd County Hospital shortly after the murders, Camm commented to Clemons that "[t]his is what they do to you when you kill your wife and kids." (Filing No. 156-12 at 2.) The Second Probable Cause Affidavit noted that Camm reportedly possessed a .380 caliber handgun, the same caliber bullet used to kill Kimberly, Jill, and Bradley, when he considered joining the Floyd County Sheriff's Department Reserves in May and September 2000. (Filing No. 156-12 at 2.) Moreover, the Second Probable Cause Affidavit indicated that a confidential informant was reportedly told by Camm that he had killed his family. (Filing No. 156-12 at 2.)

In January 2005, Gilbert learned of a new suspect when it was determined that the DNA profile from the sweatshirt found at the murder scene, which McDaniel had previously obtained, belonged to Charles Boney ("Boney"). (Filing No. 156-10 at 41.) Gilbert called Scamahorn to learn more about this. (Filing No. 156-10 at 41-42.) On February 14, 2005, Scamahorn informed Gilbert that the DNA profile had been run through the CODIS system and returned a match for Boney. (Filing No. 156-10 at 44.)

Upon learning that Boney's DNA was found on the sweatshirt, Gilbert researched Boney's past and determined that he had been incarcerated between March 1993 and June 2000 for armed robbery, criminal confinement, and criminal recklessness. (Filing No. 156-10 at 49.) Boney's

prison nickname was "Backbone." (Filing No. 156-11 at 18-19.) Gilbert further discovered that Faith knew Boney and Boney's mother. (Filing No. 156-10 at 52.) Moreover, Gilbert learned that Boney's palm print matched the palm print found on Camm's Bronco on the night of the murders. (Filing No. 156-10 at 75.) Gilbert obtained a mouth swab and fingerprints of Mala Singh ("Singh"), Boney's girlfriend, to determine if she was a match for any of the DNA found on the sweatshirt or the fingerprints found at the crime scene. (Filing No. 156-10 at 74.)

Gilbert and Wayne Kessinger ("Kessinger"), an investigator for the Floyd County prosecutor's office, first interviewed Boney on February 17, 2005. (Filing No. 156-10 at 56-57.) Gilbert met with Boney again on February 23, 2005, and advised Boney to avoid talking to anyone or reading about the Camm case because it could cause him confusion between what he knew to be true and what he might have read or heard in the news. (Filing No. 156-10 at 97-98.) On March 4, 2005, Gilbert and Boney met for a third time, during which Gilbert allowed Boney to privately write his statement over the course of four hours. (Filing No. 156-10 at 115-17.) The next day, Boney was arrested and charged with the murders of Kimberly, Jill, and Bradley. (Filing No. 156-10 at 117.)

Despite the DNA and palm print evidence against Boney, Gilbert never thought that Boney acted alone. (Filing No. 156-11 at 57.) On March 7, 2005, Gilbert and Kessinger met with Defendant Myron Wilkerson ("Wilkerson"), a Sergeant with the Indiana State Police, who requested to interview Boney along with Gilbert and Kessinger about what connections existed between him and Camm. (Filing No. 156-11 at 109-23.) In an attempt to get Boney to "open up," Gilbert told Boney that he was trying to eliminate him as a suspect to make Boney think they were on his side. (Filing No. 156-11 at 59.) After changing his story several times to address conflicts in his claims, Boney eventually admitted that he met Camm and that Camm solicited him for a

gun.  ([Filing No. 184-30 at 1](#).)  Boney stated that he was at the crime scene on the night of the murders and that he saw Camm kill his family.  ([Filing No. 184-30 at 5](#).)

In light of Boney's statements, Henderson filed a third probable cause affidavit against both Boney and Camm, signed by Gilbert on March 9, 2005 (the "Third Probable Cause Affidavit").  ([Filing No. 184-22](#).)  The Third Probable Cause Affidavit noted that Kimberly and Camm had experienced marital problems and that Kimberly had a life insurance policy in her name and riders for each of their children.  ([Filing No. 184-22 at 3](#).)  It also described Boney's claims that Camm solicited a .380 caliber handgun from Boney and that Boney went with Camm to his home on September 28, 2000, to kill Kimberly, Jill, and Bradley.  ([Filing No. 184-22 at 3](#).)  The Third Probable Cause Affidavit further noted that blood spatter evidence confirmed that both Camm and Boney were at the crime scene.  ([Filing No. 184-22 at 3-4](#).)  Additionally, the Third Probable Cause Affidavit stated that Camm told two confidential informants that he set up an alibi of playing basketball, and Camm admitted that he killed his wife and children using an untraceable weapon.  ([Filing No. 184-22 at 3](#).)

**D.**     **Second and Third Criminal Trials**

Camm's second trial began on January 16, 2006, with Henderson serving as the Floyd County Prosecutor.  *Camm v. Indiana*, 908 N.E.2d 215, 219 (Ind. 2009) ("*Camm II*").  Similar to Faith in the first trial, Henderson also used Marks and Englert as expert witnesses against Camm to discuss the blood spatter patterns found on Camm's clothing.  ([Filing No. 184-11 at 8](#).)  Although Henderson elected to not call Stites as a witness in the second trial, Stites was called by the defense to testify.  ([Filing No. 167-1 at 3](#).)  Despite the warning provided by the Indiana Court of Appeals in its reversal of Camm's first conviction, Henderson brought in evidence that Jill had

been molested.  *Camm II*, 908 N.E.2d at 220.  Camm was convicted on all three counts of murder. *Id*.

On June 26, 2009, the Indiana Supreme Court reversed Camm's second conviction and determined that the evidence of Jill's molestation brought in by the prosecution was unduly prejudicial against Camm.  *Id*. at 225.  However, the Indiana Supreme Court noted that Henderson had presented sufficient evidence that could allow a reasonable jury to convict Camm of conspiracy to commit murder and remanded the case for a new trial.  *Id*. at 229.

After his second conviction was reversed and remanded by the Indiana Supreme Court, Camm learned that days after the jury returned a guilty verdict, Henderson negotiated a deal to write a book about the Camm murders.  *Camm v. Indiana*, 957 N.E.2d 205, 207-08 (Ind. Ct. App. 2011) ("*Camm III*")[3].  Henderson continued to represent the State in post-trial proceedings and assisted the Attorney General during appellate proceedings in *Camm II*.  *Id*.  Following conclusion of appellate proceedings in *Camm II*, in December 2009, Henderson refiled murder charges against Camm.  In light of his book deal, Henderson was eventually removed from the Camm prosecution and replaced with a special prosecutor.  *Id*. at 211.  He was later disciplined by the Indiana Supreme Court. *In the Matter of Keith A. Henderson*, 78 N.E.3d 1092 (Ind. 2017).

Camm was tried a third time, beginning on August 12, 2013, and was acquitted of all charges relating to the murders of his wife and children on October 24, 2013.  (Filing No. 1 at 36.)

**E.    Current Civil Action**

On October 24, 2014, Camm initiated the instant action against all of the Indiana State Police investigators and officers, prosecutors, and prosecutor's office investigators involved in the investigatory and prosecutorial processes of his criminal case, as well as Stites and the Englert

---

[3] In *Camm III*, Camm successfully appealed the trial court's denial of his petition for the appointment of a special prosecutor.

Defendants.[4]  (Filing No. 1.)  Camm seeks damages pursuant to 42 U.S.C. § 1983 and *Brady v. Maryland*, 373 U.S. 83 (1963), because the Defendants maliciously prosecuted him, fabricated inculpatory evidence, and suppressed exculpatory evidence in violation of his Fourth and Fourteenth Amendment rights.  (Filing No. 1 at 54-62.)  Camm also contends he is entitled to damages under § 1983 because the Defendants conspired with each other to fabricate and conceal evidence in order to convict him of murder and because the Defendants acting in supervisory capacities failed to properly monitor their subordinates.  (Filing No. 1 at 63-67.)[5]  Moreover, Camm asserts Indiana tort claims for intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), negligent supervision, and *respondeat superior* against the Defendants.  (Filing No. 1 at 69-73.)

## II.  SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the Court reviews "the record in the light most favorable to the non-moving party and

---

[4] The Court entered an Order of Partial Dismissal to dismiss original defendants Floyd County, Indiana, Mark Henderson, Jackie Vaught, Tony Toran, Emily Fessel Miller, and Kessinger on December 14, 2016, and acknowledged the dismissals of original defendants James Hickerson and Steven Owen on August 25, 2017.  (Filing No. 127; Filing No. 194.)

[5] In his Complaint, Camm also brought a *Monell* claim under § 1983 specifically against Floyd County for failing to properly train, supervise, and discipline its investigators and police officers.  (Filing No. 1 at 67-69.)  However, Camm now also contends in his Response that Englert Forensics can be held liable for a *Monell* claim.  (Filing No. 184 at 80-82.)  Because this claim was brought only against Floyd County in the Complaint and because Floyd County was dismissed with prejudice on December 14, 2016, Camm's *Monell* claim is **DISMISSED as moot**.

draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. DISCUSSION

The First Investigators, Faith, Gilbert, Henderson, the Englert Defendants, and Stites, each respectively filed Motions for Summary Judgment on May 23, 2017. (Filing No. 148; Filing No. 150; Filing No. 152; Filing No. 154; Filing No. 157; Filing No. 160.) The First Investigators, Faith, Gilbert, and Henderson (collectively, the "State Actors") assert that they cannot be liable for malicious prosecution because probable cause existed to arrest and prosecute Camm based on the HVIS evidence found on his clothing, and, even if probable cause did not actually exist, they

are protected by qualified immunity. (Filing No. 149 at 25-30; Filing No. 151 at 19-23, 25-28; Filing No. 153 at 15-20; Filing No. 155 at 15-20, 22-24.) The State Actors also contend that they cannot be liable for any of Camm's Indiana state law claims because they are immune under the ITCA. (Filing No. 149 at 24; Filing No. 151 at 17; Filing No. 153 at 14; Filing No. 155 at 13.) Prosecutors' Faith and Henderson assert they cannot be liable for any of Camm's claims because are entitled to absolute prosecutorial immunity. (Filing No. 151 at 23-25; Filing No. 155 at 20-22.)

In their Motions for Summary Judgment, the Englert Defendants and Stites argue that there is no evidence to support any of Camm's federal or state law claims against them and that many of Camm's claims are time-barred by statutes of limitation. (Filing No. 158 at 13-24, 26-35; Filing No. 161 at 11-33.) Additionally, the Englert Defendants and Stites contend that, even if there was sufficient evidence to hold them liable under Indiana or federal law, they are protected by qualified immunity in connection with their investigatory actions and absolute immunity in relation to their witness testimony. (Filing No. 158 at 15-16, 25-26; Filing No. 161 at 30-34.)

On July 20, 2017, Camm filed his Response to all of the Defendants' Motions for Summary Judgment. (Filing No. 184.) Camm asserts that probable cause did not exist at any point because Stites' unqualified opinion regarding HVIS evidence cannot be the basis for finding probable cause against him. (Filing No. 184 at 54-58.) He also argues that the Defendants remain liable for *Brady* violations because they concealed DNA evidence, because of Henderson's book deal, and because they allowed Stites and Englert to provide faulty evidence about their credentials and the reputability of the blood spatter "science." (Filing No. 184 at 62-63.) Camm further asserts that all of the Defendants' conduct was so egregious that it "shocks the conscience" in violation of his substantive due process rights. (Filing No. 184 at 61-62.) He argues that the Defendants bear

conspiracy liability under § 1983 because they entered into a common venture to maliciously prosecute him. (Filing No. 184 at 64.) Camm contends that none of the Defendants are entitled to any form of immunity in relation to their actions. (Filing No. 184 at 65-69.) He also claims that the Defendants in supervisory roles can still be liable for their failure to properly supervise pursuant to § 1983 under a supervisory liability theory. (Filing No. 184 at 69-70.) With regard to his state tort claims, Camm argues that the Englert Defendants can be held liable under Indiana law as a result of the damages they have caused him. (Filing No. 184 at 72-75.) The Court will begin its analysis with the federal claims.

**A.      Section 1983 Claims**

To determine whether a claim brought under § 1983 can survive summary judgment, a court must focus on "'(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Armato v. Grounds*, 766 F.3d 713, 719-20 (7th Cir. 2014) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Camm brings claims against the Defendants under § 1983 for malicious prosecution, *Brady* violations, fabrication of evidence, failure to adequately investigate, substantive due process violations, conspiracy, and supervisory liability. (Filing No. 1 at 54-67.)

**1.      Immunity from § 1983 Claims**

Before evaluating whether Camm's § 1983 claims can survive summary judgment, the Court will addresses whether any of the Defendants are entitled to immunity from his § 1983 claims. Faith and Henderson both assert that they are entitled to absolute immunity as prosecutors as well as qualified immunity. (Filing No. 151 at 23-25; Filing No. 155 at 20-22.) Stites and the Englert Defendants contend they are entitled to absolute immunity as witnesses. All of the

Defendants assert that they are protected by qualified immunity for their actions in relation to the Camm investigations. (Filing No. 149 at 29-30; Filing No. 153 at 19-20; Filing No. 158 at 15-16; Filing No. 161 at 30.)

### a) Absolute Immunity

"An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). Prosecutors generally receive absolute immunity from civil suits for damages under § 1983 based on actions related to initiating a prosecution and presenting the State's case. *See id.* at 431. However, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). The court must look to the nature of the functions being performed in the case. *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009); *see also*, *Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016). The absolute immunity applies "only for acts [prosecutors] commit within the scope of their employment." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). "[W]hen a prosecutor is not acting as an 'officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks," the prosecutor is not entitled to absolute immunity. *Van de Kamp*, 555 U.S. at 342; *see also, Fields*, 740 F.3d at 1111.

Faith and Henderson assert that they are entitled to absolute immunity for their actions in furtherance of their prosecutions against Camm. In his Response, Camm argues that Faith and Henderson are not entitled to absolute immunity because of their roles as investigators before the initiation of their prosecutions. (Filing No. 184 at 75-76.) Faith entered the crime scene shortly after officers arrived at the scene and during the initial investigation gave officers and investigators directions and gathered evidence. In addition, the day after the murders, Faith, rather than

Clemons, contacted the Englert Defendants to come process the scene. Camm argues that Henderson, in addition to acting through his lead investigator Kessinger, personally directed aspects of the second investigation. ([Filing No. 184 at 41](#).) The Court agrees with Camm; to the extent Faith and Henderson acted in investigatory capacities during the preliminary investigation periods, they are not protected by absolute immunity. Upon review of the designated evidence in this case, the Court determines that there is a genuine dispute of material fact regarding whether Faith and Henderson acted outside the prosecutorial role based on their investigatory actions in Camm's criminal cases. Accordingly, Faith and Henderson are not entitled to absolute immunity.

Witnesses also enjoy absolute immunity from civil liability on claims stemming from their testimony at trial. *See Briscoe v. LaHue,* 460 U.S. 325, 345–46 (1983), *see also, Canen v. Chapman*, 847 F.3d 407, 415 (7th Cir. 2017) ("It is long-established that witnesses enjoy absolute immunity."). That immunity also covers preparing to testify. *Buckley v. Fitzsimmons,* 919 F.2d 1230, 1245 (7th Cir. 1990). Witnesses are entitled to such immunity because subjecting them to § 1983 liability for their trial testimony "might undermine . . . their contribution to the judicial process." *Juriss v. McGowan,* 957 F.2d 345, 349 (7th Cir. 1992) (quoting *Briscoe,* 460 U.S. at 343).

Stites and the Englert Defendants assert that, as expert witnesses, they are entitled to absolute immunity. In response, Camm explains that while witness absolute immunity does apply to expert witnesses in certain instances, an expert witness may not mislead other experts by engaging in fraud. *Bembenek v. Donohoo,* 355 F. Supp. 2d 942, 943 (E.D. Wis. 2005). In a conclusory fashion, Camm argues that Stites and the Englert Defendants are "con artists," that "Stites invented evidence which became the main part of the charging document, and Englert, who should not have sent him in the first place, ratified his [Stites'] conclusions over the phone." ([Filing](#)

No. 184 at 78-79.)    Although, Camm has designated some evidence regarding Stites to support his allegations, he has not presented evidence of actual fraud. Assuming absolute immunity does not apply, for reasons explained below, Stites and the Englert Defendants would still enjoy qualified immunity.

### b) Qualified Immunity

Unlike an official with absolute immunity, "[t]he fate of an official with qualified immunity depends upon the circumstances and motivations of his actions."  *Imbler*, 424 U.S. at 419 n.13. Qualified immunity provides a defense so that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether qualified immunity applies, the court should determine whether, when taken in a light most favorable to the injured party, "the facts alleged amount to a constitutional violation" of a constitutional right that was "clearly established" at the time of the alleged violation.  *Phelan v. Vill. of Lyons*, 531 F.3d 484, 488 (7th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he was doing violates that right."  *Humphries v. Milwaukee Cty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citation and quotation marks omitted).  "While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (citation and quotation marks omitted).

If the First Investigators and Gilbert did not violate a clearly established constitutional right, they are immune from liability for their investigatory functions pursuant to the qualified

immunity doctrine. Additionally, to the extent they acted as investigators, Faith and Henderson would be entitled to qualified immunity similar to other state investigators.

Stites and the Englert Defendants also assert that they are protected by qualified immunity. Although they are private actors, Stites and the Englert Defendants performed their relevant functions under the color of state law and on behalf of the government. Where private actors are retained to perform work on behalf of the government and under the direct instruction and supervision of government officials, the private actors are entitled to the same qualified immunity available to government employees. *See Meadows v. Rockford Housing Authority*, 861 F.3d 672, 677-78 (7th Cir. 2017); *see also*, *Filarsky v. Delia*, 566 U.S. 377, 389-91 (2012) ("immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis"). Therefore, because Stites and the Englert Defendants were hired to perform investigatory functions on behalf of government officials, they are equally entitled to qualified immunity where they did not violate a clearly established constitutional right.

### 2. **Malicious Prosecution**

Camm first asserts that the Defendants can be held liable for malicious prosecution under § 1983 because they lacked probable cause to continue prosecuting him for the murders of his wife and children, and they maliciously pursued him despite a lack of probable cause. (Filing No. 184 at 53-60.)

Although "it is well-settled that there is no constitutional right not to be prosecuted without probable cause," *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014) (internal quotation marks omitted), a federal claim for malicious prosecution may implicate the right to due process under the Fourteenth Amendment if state law does not provide a similar cause of action or remedy. *Katz-*

*Crank v. Haskett*, 843 F.3d 641, 648 (7th Cir. 2016).  Indiana does confer a remedy for malicious prosecution; however, the Indiana Tort Claims Act ("ITCA") grants broad immunities to public employees acting within the scope of their employment.  *Id.*  Because the ITCA effectively blocks any common law claims of malicious prosecution against government actors, this statutory immunity "opens the door to federal malicious prosecution suits against such officers" under the Fourteenth Amendment, pursuant to § 1983.  *Id.* (internal quotation marks omitted).

"To state a claim for malicious prosecution under § 1983, a plaintiff must demonstrate that (1) he has satisfied the elements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty."  *Welton*, 770 F.3d at 674.  The elements of malicious prosecution under Indiana law are "(1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor."  *Id.* (internal quotation marks omitted).  A plaintiff may demonstrate malice through "evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances."  *Id.* (internal quotation marks omitted).

At the outset, claims for malicious prosecution against police officers and investigators are "anomalous" because such officers do not actually prosecute individuals.  *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996).  However, even if Camm could properly assert malicious prosecution claims against all of the Defendants, his malicious prosecution claims fail because probable cause existed to support his arrest and prosecutions.[6]

---

[6] Although Camm does not assert an Eighth Amendment claim in his Complaint, Camm contends in his Response that Defendants violated his Eighth Amendment rights because he was incarcerated longer than necessary as a result of the Defendants' lack of probable cause.  (Filing No. 184 at 70-71.)  Even if Camm had properly stated such a claim

An officer has probable cause if "a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014). This practical definition "'requires something more than a hunch,' but it 'does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity.'" *Goldberg v. Junion*, 208 F. Supp. 3d 977, 984 (S.D. Ind. 2016) (quoting *Abbott v. Sangamon Cty.*, 705 F.3d 706, 714 (7th Cir. 2013)). Determining whether a police officer has probable cause "is an objective inquiry; we do not consider the subjective motivations of the officer." *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). "The determination of probable cause is normally a mixed question of law and fact, but when 'what happened' questions are not at issue, the ultimate resolution of whether probable cause existed is a question of law." *Smith v. Lamz*, 321 F.3d 680, 685 (7th Cir. 2003) (internal citations omitted).

The Court determines that probable cause existed at the time the First Probable Cause Affidavit was drafted and Camm was arrested. Based on the Englert Defendants' analyses, the First Investigators and Faith believed that HVIS evidence was present on Camm's clothing, which would have placed him near the victims at the time of the murders, and there is no evidence indicating that any of the First Investigators or Faith had any reason to doubt their analyses. (Filing No. 156-3 at 102; Filing No. 156-4.) Camm even admits that the presence of HVIS evidence on a suspect's shirt would generally be sufficient to support a finding of probable cause. (Filing No. 156-1 at 70-71.) The timeline that Clemons had developed at that point would have also put Camm

---

in his Complaint, any such claim for an Eighth Amendment violation would be dismissed because Defendants had probable cause to support Camm's arrest and subsequent incarceration, as discussed herein.

at his house around the time of the murders based on the banging sounds reported by Mrs. Ter Vree and Camm's statements regarding when he returned home from the basketball games. (Filing No. 156-3 at 36.) Furthermore, Floyd County Judge Striegel determined that probable cause existed based on the First Probable Cause Affidavit, which constitutes *prima facie* evidence of probable cause. (Filing No. 156-1 at 249-250; Filing No. 156-4); *see also, Marten v. Swain*, 242 F. Supp. 3d 744, 762 (S.D. Ind. 2017). Camm's assertions that the Defendants failed to thoroughly investigate the murders is without merit to defeat probable cause. "When a judicial determination of probable cause has been made, the *prima facie* case cannot be overcome by a showing of a negligent failure to investigate thoroughly." *Glass v. Trump Indiana, Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004).

Probable cause also existed to support Camm's arrest and prosecution after his first conviction was reversed. As described in the Second and Third Probable Cause Affidavits, Gilbert and Henderson similarly had reason to believe HVIS evidence was present on Camm's shirt from the night of the murders based on Gilbert's review of the first investigation records and his conversations with state police blood spatter experts, Bevel and Marks. (Filing No. 156-10 at 33-35, 82-83.) The Second and Third Probable Cause Affidavits also indicate that Camm had access to a .380 caliber handgun around the time of the murders. (Filing No. 156-12 at 2; Filing No. 184-22 at 3.) Furthermore, Gilbert received statements from confidential informants that Camm admitted to committing the murders and from Boney that he witnessed Camm kill his family. (Filing No. 156-12 at 2; Filing No. 184-22 at 3); *see also, Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007) (holding that information provided by a reasonably credible witness or victim can be the basis for finding probable cause).

Even if probable cause did not actually exist in this instance, the First Investigators, Gilbert, Stites and the Englert Defendants are protected by qualified immunity because they could reasonably believe the HVIS evidence found on Camm's clothing demonstrated that Camm was close to the victims at the time of the murders, which, along with the other evidence available, supported a finding of probable cause. *See Abbott*, 705 F.3d at 714-15 (finding that "officers who reasonably but mistakenly believe that probable cause exists" are shielded by qualified immunity).

To the extent they acted as investigators prior the commencement of their prosecutions against Camm, Faith and Henderson are similarly shielded by qualified immunity because the evidence available would have allowed them to reasonably believe they had probable cause to prosecute Camm. As such, Camm cannot sustain malicious prosecution claims against any of the Defendants.

### 3. *Brady* Violations, Fabrication of Evidence, and Failure to Adequately Investigate

In his Complaint, Camm alleges that the Defendants fabricated inculpatory evidence regarding Boney's confession that implicated him. He alleges that Stites' HVIS assessment concealed or failed to preserve material exculpatory and impeachment evidence and that all of the Defendants failed to conduct a constitutionally adequate investigation. (Filing No. 1 at 56-61.) Specifically, Camm contends the Defendants violated *Brady* because (1) Faith and Clemons failed to run the sweatshirt DNA through CODIS while claiming they had; (2) Stites lied about his credentials; (3) Englert invented "an entire field of 'science'" he knows to be fraudulent; and (4) Henderson concealed his book and profit motive for Camm's continued prosecution. (Filing No. 184 at 63.)

**a)** ***Brady***

In *Brady*, the Supreme Court held the suppression of evidence favorable to a criminal defendant violates the defendant's due process rights if the evidence is material to either his guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87. "[A] *Brady* violation only occurs if material evidence is withheld, that is if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Kimoto*, 588 F.3d 464, 474 (7th Cir. 2009) (internal quotation marks omitted). If disclosure is ultimately made "before it is too late for the defendants to make use of any benefits of evidence," no *Brady* violation will have occurred. *Id*. (internal quotation marks omitted). To establish a *Brady* violation, one must prove that "(1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." *Id*. (internal quotation marks omitted).

As an initial matter, Stites and the Englert Defendants assert that Camm's *Brady* claims are time-barred by the applicable statutes of limitation. The Court disagrees. The Englert Defendants argue that the applicable statute of limitation began when the allegedly exculpatory evidence was revealed by the end of the second trial, even though Camm had not yet been acquitted. (Filing No. 158 at 20-21; Filing No. 161 at 11-13.) However, the accrual of *Brady* violations aligns closely with claims for malicious prosecution, which do not become ripe until a conviction or sentence has been reversed, expunged, or otherwise considered invalid. *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008) (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)). Therefore, Camm's *Brady* claims did not accrue until after he was acquitted on October

24, 2013, and thus, his *Brady* claims were timely filed on October 24, 2014. *See Johnson*, 515 F.3d at 782.

Despite making his claims within the applicable statutes of limitation, Camm provides no evidence that could allow a reasonable jury to find that any of the Defendants concealed or suppressed evidence in violation of *Brady*. Camm offers no evidence demonstrating that any of the Defendants concealed or suppressed evidence from his criminal defense attorneys. Although Camm alleges that Faith and Clemons concealed evidence because they did not process the sweatshirt found at the crime scene through the CODIS system, this failure to gather evidence cannot constitute suppression of evidence because such evidence was also unavailable to the government. Furthermore, the evidence that was available at the time of the first trial regarding the sweatshirt was actually produced by Camm's defense team. (Filing No. 184 at 21.) As such, Camm cannot practically assert that such evidence was concealed from him by any of the Defendants.

Regarding Henderson, Camm contends that concealment of his book deal violated *Brady* as the secret book deal gave Henderson a monetary stake in his continued prosecution. Camm argues that he was prejudiced because "instead of recusing himself from the case in the face of a clear ethical violation, Henderson fought Camm's petition [to have him removed] for more than two years - time during which Camm sat in prison." (Filing No. 184 at 53). Henderson's actions are indeed very troubling and, as the Indiana Supreme Court recently noted, constituted professional misconduct. (*See In the Matter of Keith A. Henderson*, 78 N.E. 3d 1092 (Ind. 2017)). However, Camm has not provided any evidence showing how such a concealment prejudiced him with respect to his trial or how such evidence would have changed the outcome of his second trial.

*See Kimoto*, 588 F.3d at 474. Furthermore, evidence of Henderson's book deal was not exculpatory or impeaching for Camm in relation to his murder charges.

Camm also cannot sustain a *Brady* claim based on Stites' credentials or use of blood spatter analysis because in Indiana, "a witness may qualify as an expert on the basis of practical experience alone," *Kubsch v. State,* 784 N.E.2d 905, 921 (Ind. 2003), and "[a] lack of extensive formal training or experience goes to the weight of the expert testimony rather than to its admissibility," *White v. State,* 547 N.E.2d 831, 837 (Ind. 1989). In addition, Stites was not obligated to expose the limitations of his training. *See Canen,* 847 F.3d at 414-15 ("Ms. Canen has pointed us to no case that establishes the legal principle that an officer is obliged to reveal the limitations on his training when he has stated his background, such as it is, and then exposed himself to cross-examination by the defense."). Moreover, Camm cannot demonstrate that Stites' testimony regarding his educational background was prejudicial, especially in light of the fact that defense counsel strategically chose not to disqualify Stites as a witness. (Filing No. 159-17 at 3.) Additionally, while Camm contends that the field of blood spatter analysis is fraudulent, Indiana courts have consistently found blood spatter analysis to be an acceptable science. *See Green v. Indiana*, 65 N.E.3d 620 (Ind. Ct. App. 2016); *Grinstead v. Indiana*, 684 N.E.2d 482 (Ind. 1997). Because these issues focus on the credibility of the evidence presented, rather than suppressing or concealing evidence, Camm cannot support a *Brady* claim based on Stites' testimony or the use of blood spatter analysis evidence against him.

**b) Failure to Preserve Evidence**

Camm fails to provide sufficient evidence to support his claim for failure to preserve evidence. In his Complaint, Camm alleges that several items were intentionally or recklessly destroyed. (Filing No. 1 at 58-59.) While a criminal defendant may assert a claim against the

government under § 1983 for failing to preserve evidence, "'unless [he] can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Kimoto*, 588 F.3d at 475 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). To establish a claim for failure to preserve evidence, one must prove: (1) the government acted in bad faith; (2) the exculpatory value of the evidence was clear before it was destroyed; and (3) comparable evidence could not be obtained by other reasonable means. *Id.* Assuming that Camm has provided sufficient evidence that some of the Defendants acted in bad faith, he is unable to satisfy the remaining prongs of the test. Camm has not designated any evidence demonstrating that any that any of the allegedly destroyed evidence was clearly exculpatory or that similar evidence was not otherwise available; therefore, Camm's claims for failure to preserve evidence must fail.

### c) Fabrication of Evidence

Although Camm may assert a separate claim for fabrication of evidence under § 1983, *Saunders-El v. Rohde*, 778 F.3d 556, 559 (7th Cir. 2015), such a claim fails in this instance. Camm alleges that the Defendants fabricated evidence against him by coercing Boney into stating he conspired with Camm to commit the murders. (Filing No. 1 at 57-58.) However, while coercively interrogating witnesses "may be deplorable," it does not necessarily create a constitutional violation, even if that coerced information is introduced at trial, because, unlike falsified evidence or perjured testimony, it may turn out to be true. *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (quoting *Whitlock v. Brueggemann,* 682 F.3d 567, 584 (7th Cir. 2012)). "Much testimony is inaccurate, but not deliberately so and therefore not false or fabricated . . . ." *Fields*, 740 F.3d at 1110. Therefore, even though Camm alleges that Boney's confession was fabricated based on the

interrogation tactics used by Gilbert, Kessinger, and Wilkerson, coerced testimony alone does not support a constitutional violation under § 1983.

### d) **Failure to Investigate**

Camm cannot sustain a claim against any of Defendants based upon a failure to adequately investigate. In his Complaint, he alleges that the Defendants violated his "Fourteenth Amendment rights by intentionally, recklessly, or with deliberate indifference failing to conduct a constitutionally adequate investigation" of the murders. ([Filing No. 1 at 59-60](#).) In a conclusory statement, Camm argues, "Defendants, because of more than four years of shoddy investigative work, would not discover the identity of the person who actually killed Camm's family for another three months." ([Filing No. 184 at 41](#).) However, Camm "does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction." *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015). "[M]ere inactivity by police does not give rise to a constitutional claim . . . . [T]he plaintiff must also show that the police's actions harmed his ability to obtain appropriate relief." *Id.* at 735-36; *see also, Everling v. Ragains*, No. 1:14-cv-00024-TWP-DML, 2015 WL 1319707, at *5 (Mar. 23, 2015) ("[I]nadequate investigation is not an actionable claim.").

In *Rossi*, the Seventh Circuit discussed two decisions where the court examined police cover-ups of varying orders of magnitude. The first case, *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), involved an egregious police cover-up that effectively denied a plaintiff judicial access. In the other case, *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995), the court held the plaintiff was not denied judicial access notwithstanding a faulty initial investigation. In *Bell*, police officers shot a man under questionable circumstances, conspired to plant a knife on him, and then engineered an investigation designed to conceal rather than reveal the truth, which

secured the officers' settlement bargaining position and denied Bell access to justice. *Rossi*, 790 F.3d at 736. In *Rossi* and *Vasquez*, the court found neither were denied judicial access because, despite cover-up or failure to investigate, the plaintiffs were able to pursue legal redress at all times. Because Camm has not provided evidence demonstrating that any of the Defendants, through their investigations, harmed his ability to obtain relief, Camm cannot sustain a claim relating to the Defendants' failure to conduct an adequate investigation.

### 4. Substantive Due Process

In his Complaint, Camm similarly alleges that the Defendants violated his substantive due process rights by coercing witnesses, concealing and destroying exculpatory evidence, covering up their own misconduct, and refusing to follow leads implicating other suspects, inducing them to identify Camm, "in a concerted effort to justify Camm's arrest, prosecution and conviction although every shred of reliable evidence demonstrated his innocence." (Filing No. 1 at 62.) In his Response, Camm argues that the Defendants' "outrageous accusations of child molestation *alone*" are sufficient to find that they violated his substantive due process rights even if such accusations were not also tied to accusations of murdering his family. (Filing No. 184 at 72.) (Emphasis in original.)

A plaintiff can sustain a claim based on a violation of his or her substantive due process rights under § 1983 for behavior by government officials that "shocks the conscience." *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005); *see also, Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (addressing applicability of § 1983 substantive due process claims in relation to actions taken by police officers). "'[O]nly the most egregious' conduct may be condemned" as substantive due process violations. *Christensen v. County of Boone, Ill.*, 483 F.3d 454, 464 (7th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "Determining what constitutes such

behavior can be difficult . . . . Lying to, threatening, or insulting a suspect does not shock the conscience. And the official conduct most likely to rise to the conscience-shocking level is the conduct intended to injure in some way unjustifiable by any government interest." *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) (internal citations omitted); *see also, Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." (emphasis in original)).

Because probable cause existed to support the belief that Camm committed the murders of his wife and children, *see supra,* Section III.A.2, a reasonable jury could not find that the Defendants' efforts in this case to investigate the murders, pursue Camm as a suspect, and prosecute him constituted outrageous or conscience-shocking behavior. Although Camm argues that Gilbert, Kessinger, and Wilkerson coerced Boney's statements through lengthy, pressure-filled interrogations about his connections with Camm and by telling Boney they were trying to help and protect him, such tactics constitute ordinary interrogation methods and do not shock the conscience. *See Cairel*, 821 F.3d at 833 (determining that insistent interrogation and falsely promising relief do not constitute conscience-shocking interrogation tactics). Additionally, Camm has provided no evidence that any of the Defendants covered up any exculpatory evidence or their own misconduct in a way that would shock the conscience or that the Defendants' allegedly conscience-shocking behavior was intended to injure him. *See Chavez*, 538 U.S. at 775 (finding that a police officer's questioning of a suspect did not rise to the level of conscience-shocking behavior in violation of the suspect's substantive due process rights because "there [was] no evidence that [the officer] acted with a purpose to harm" the suspect). Because the evidence indicates that neither of the Camm investigations nor prosecutions constituted outrageous or

conscience-shocking behavior intended to harm Camm, the Defendants are entitled to summary judgment as to Camm's substantive due process claims.

### 5. <u>Civil Rights Conspiracy</u>

Camm further alleges that the Defendants conspired to violate his civil rights and that he is therefore entitled to recover damages under § 1983 for conspiracy. ([Filing No. 1 at 65-67](.).) "To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013) (internal quotation marks omitted); *see also*, *Whitlock*, 682 F.3d at 577 ("There must be evidence of a concerted effort between a state actor and [a private] individual."). A defendant can only be liable as a conspirator if he or she is "a voluntary participant in a common venture, although [he or she] need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). A defendant must "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [his or her] part to further them" in order to be liable for a conspiracy under § 1983. *Id*.

Camm argues that the Defendants participated in a common venture to maliciously prosecute him in order to get him convicted "at any cost" and that the Defendants knew or should have known that the prosecution was malicious in light of the discovery of Boney. ([Filing No. 184 at 64](.).) However, Camm has not provided any evidence that would allow a reasonable jury to find that a conspiracy existed between the Defendants or that the Defendants had any common understanding or goal to maliciously prosecute him. While Camm correctly points out that the law does not require an "explicit agreement" in order to demonstrate a conspiracy under § 1983 ([Filing No. 207 at 3-4](.)), he has failed to demonstrate that any common understanding existed

among the Defendants.  Camm even admits that he lacks evidence of any agreement between any of the Defendants to target him alone for the murders or to ignore Boney as a suspect.  ([Filing No. 156-1 at 256](#).)  Although Faith called the Englert Defendants and requested that they come to evaluate the crime scene ([Filing No. 156-8 at 30-31](#)), nothing in the record suggests that either Englert or Stites knew of Camm or any of the Indiana State Police officers involved in the case before investigating the crime scene or that either of them knew of an intention to maliciously prosecute Camm.  Furthermore, the Defendants could not have conspired to maliciously prosecute Camm in this case because they had probable cause to investigate and prosecute him, eliminating the possibility of malicious prosecution.  *See supra,* Section III.A.2.  Because Camm failed to provide any evidence that the Defendants voluntarily participated in a common venture against him, Camm cannot sustain his § 1983 conspiracy claim against the Defendants.

### 6.     **Supervisory Liability**

In addition to his § 1983 claims against the Defendants in their individual capacities, Camm asserts claims for supervisory liability against Faith, Walls, Biddle, Neal, Henderson, and Englert (collectively, the "Supervisory Defendants") in relation to their supervisory roles in the Camm investigations.  ([Filing No. 1 at 63-65](#); [Filing No. 184 at 79-80](#).)

Although a supervisor cannot be held liable under § 1983 pursuant to the doctrine of *respondeat superior*, a supervisor may be held personally liable under § 1983 if the supervisor knows its subordinate violated the plaintiff's constitutional rights and "approves of the [subordinate's] conduct and the basis for it."  *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (internal quotation marks omitted); *see also, Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 869-70 (7th Cir. 2011).  For a supervisor to be held personally liable for the conduct of their subordinates, the supervisor must be personally involved in their subordinates' conduct.

*Chavez*, 251 F.3d at 651.  Thus, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."  *Id*. (internal quotation marks omitted); *see also, Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010).  A supervisor must "act either knowingly or with deliberate, reckless indifference" to be personally liable under § 1983; mere negligence "in failing to detect and prevent subordinates' misconduct" is not sufficient to support supervisory liability.  *Id*. (internal quotation marks omitted).

While Camm asserts that "Walls and Biddle acted in a supervisory capacity over the ISP Defendants who were at the scene," (Filing No. 184 at 80), the record is devoid of any evidence indicating Walls or Biddle knew of any allegedly unconstitutional behavior conducted by their subordinate Indiana State Police officers or that they facilitated, approved, condoned, or turned a blind eye toward any such behavior.  Therefore, there is no evidence supporting Walls' or Biddle's personal involvement in any unconstitutional behavior.  Without any such evidence, Camm cannot maintain a § 1983 supervisory liability claim against either Walls or Biddle. Similarly, although the evidence indicates that Faith and Henderson offered direction to the Indiana State Police regarding their investigations, it does not demonstrate that either Faith or Henderson, as county prosecutors, had a direct, supervisory capacity over any of the Indiana State Police officers assigned to either of the Camm investigations or that they had any personal involvement in any of the officers' alleged misconduct.  (Filing No. 156-3 at 44-45.)

Even if the Supervisory Defendants did act as supervisors, none of the Supervisory Defendants can be held liable under a supervisory liability theory because Camm has failed to demonstrate that any of their purported subordinates' conduct constituted an underlying constitutional violation.  As stated in the sections above, Camm has failed to provide evidence to support his constitutional claims against any of the Defendants.   Without an underlying

unconstitutional action by their alleged subordinates, Camm is unable to point to any misconduct in which any of the Supervisory Defendants actively participated or to which they turned a blind eye or approved. *See Chavez*, 251 F.3d at 651. As such, Camm cannot recover damages in relation to his § 1983 claims based on supervisory liability, and the Supervisory Defendants are entitled to summary judgment with respect to Camm's supervisory liability claims.

## B.    Indiana State Law Claims

In addition to his claims under § 1983, Camm brought several Indiana tort claims against the Defendants. Specifically, Camm stated claims against all of the Defendants for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") for harm he sustained as a result of being falsely arrested, maliciously prosecuted, and wrongly imprisoned. (Filing No. 1 at 69-70.) Camm also asserts claims for negligent supervision and *respondeat superior* against the First Investigators, Faith, Henderson, and Englert in connection with their alleged control over their employees and failure to properly supervise and train their subordinates. (Filing No. 1 at 48, 71-73.)

In their Motions for Summary Judgment, the State Actors assert that they cannot be held liable for Camm's Indiana state law claims because they are immune from such claims under the ITCA. (Filing No. 149 at 24; Filing No. 151 at 17; Filing No. 153 at 14; Filing No. 155 at 13.) The Englert Defendants and Stites also argue that Camm's state law claims must be dismissed as they relate to them because Camm failed to bring his state law claims within the applicable statute of limitations and failed to provide sufficient evidence to support such claims against them. (Filing No. 158 at 30-35; Filing No. 161 at 11-13, 31-33.)[7]

_____

[7] In his Response, Camm failed to address the State Actors' ITCA arguments and the Englert Defendants' statute of limitations arguments. Therefore, he waives his ability to respond to either of these arguments. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

### 1. State Law Claims against State Actors

The Court agrees with the State Actors that they are immune from liability for Camm's Indiana tort claims pursuant to the ITCA. Under the ITCA, a government entity or employee acting within the scope of his or her employment cannot be liable for Indiana tort claims as a result of "[t]he initiation of a judicial or an administrative proceeding" or "[t]he performance of a discretionary function." Ind. Code §§ 34-13-3-3(6); (7). Because Camm's IIED and NIED claims are based on the initiation of the criminal proceedings against him, the State Actors are immune from liability for those claims. Additionally, because the employment and supervision of government officials is considered to be a discretionary function, the State Actors are also immune from any liability for negligent supervision or *respondeat superior*. *See Strain v. Minnick*, No. 2:14-cv-00374-WTL-WGH, 2015 WL 6550628, at *4 (S.D. Ind. Oct. 28, 2015) (quoting *Foster v. Pearcy*, 387 N.E.2d 446, 449-50 (Ind. 1979) ("Generally, 'the employment and supervision of deputies and employees in governmental offices . . . is a discretionary function' immunized under the ITCA."). Therefore, the State Actors are immune from liability for all of Camm's Indiana state law claims pursuant to the ITCA.

### 2. State Law Claims against the Englert Defendants and Stites

With respect to Camm's Indiana tort claims, the Englert Defendants and Stites argue that Camm's claims are time-barred because Camm did not file them within the applicable two-year statute of limitations. (Filing No. 158 at 30; Filing No. 161 at 11-13.) Indiana tort actions are governed by Indiana Code § 34-11-2-4, which requires a tort action be commenced within two years from the date on which it accrues. "The standard discovery rule in Indiana is that the claim 'accrues at the time the individual knew or should have known of the tort,'" and that an injury had been sustained. *Cordova v. Univ. of Notre Dame Du Lac*, 936 F. Supp. 2d 1003, 1012 (N.D. Ind.

2013).  While the Englert Defendants argue that Camm should have known these state law torts had occurred after his second conviction was reversed in 2012 and are time-barred, Camm failed to provide sufficient evidence to support his state law claims regardless of the applicable statute of limitations.

To establish a claim for IIED under Indiana law, a plaintiff must demonstrate "that the defendant (1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another."  *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 549 (Ind. Ct. App. 2015) (internal quotation marks omitted).  The basis of the tort of IIED "is the intent to harm the plaintiff emotionally."  *Id*. at 550 (internal quotation marks omitted). The requirements to prove the elements of an IIED claim are "rigorous," and "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community," based on prevailing cultural norms and values.  *Id*. (internal quotation marks omitted).  A case that would result in liability for IIED would generally be "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Id*. (internal quotation marks omitted).

In this case, the designated evidence merely shows that the Englert Defendants were called to investigate the crime scene. They analyzed the blood spatter pattern evidence available at the scene and provided factual expert testimony at Camm's trials.  While the Englert Defendants ultimately provided evidence that worked against Camm's interests, nothing within the record describes any conduct by the Englert Defendants that would be considered "extreme and outrageous conduct."

Camm contends that Stites was incompetent and asserts that he has designated evidence that shows Stites misrepresented his credentials during his first criminal trial (Filing No. 184 at 34-38). However misrepresentations by a witness regarding their credentials is not outrageous conduct. The determination of whether Stites was competent and qualified to testify was within the discretion of the trial court. Camm could have objected to Stites' testimony, cross-examined him, or impeached him regarding his credentials and competence, but for strategic reasons, his trial counsel chose not to do so. Regarding his fieldwork, Camm has failed to identify any evidence that Stites knew his initial fieldwork was knowingly false or his opinions were dishonest. Furthermore, Camm offers no evidence that Stites or the Englert Defendants intended to cause him emotional harm through their analyses or testimony. Without any evidence indicating that Stites or the Englert Defendants engaged in extreme and outrageous conduct or that they specifically intended to inflict emotional harm on him, Camm cannot support his IIED claim against them.

Camm also fails to support his claim for NIED against the Englert Defendants. Under Indiana law, "stand-alone actions for [NIED] are not cognizable." *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011). Instead,

> actions seeking damages for emotional distress resulting from the negligence of another are permitted in two situations: where the plaintiff has (1) witnessed or come to the scene soon thereafter the death or severe injury of certain classes of relatives (i.e., the bystander rule) or (2) suffered a direct impact (i.e., the modified impact rule).

*Id*. (internal citations omitted). To fall under the scope of the bystander rule, "the death/severe injury must have been proximately caused by the defendant's breach of some cognizable legal duty owed by the defendant *to the relative* at issue." *Id*. (emphasis in original). The modified impact rule applies only where the direct impact sustained by the plaintiff was proximately caused by the defendant's breach of a legal duty to either the plaintiff himself or a third party. *Id*.

In this instance, Camm has offered no evidence that would allow him to maintain a claim for NIED against Stites or the Englert Defendants under either the bystander rule or the modified impact rule. Although Camm did in fact come to the crime scene shortly after the deaths of his wife and children, there is no evidence indicating that their deaths were caused by Stites or the Englert Defendants or that either owed any duty to Kimberly, Jill, and Bradley. Instead, the evidence shows that Stites was provided with very little information about the murders or victims before arriving at the scene two days after the murders. (Filing No. 184-5 at 11.) Furthermore, Camm's NIED claim does not fall under the modified impact rule because there is no evidence suggesting that Camm was directly impacted as a result of Stites' or the Englert Defendants' analyses or that either owed a duty of any kind to Camm or any third party. Therefore, Camm's NIED claims against Stites and the Englert Defendants fail.

Camm also alleges claims for negligent supervision and *respondeat superior* against Englert and Englert Forensics based on Stites' actions in relation to the Camm investigations and trials. (Filing No. 1 at 71-73; Filing No. 184 at 84-85.) "In most circumstances, negligent supervision and [*respondeat superior*] are alternative theories for holding an employer liable for the torts of its employee—the former applies when the employee acts outside the scope if its employment, and the latter applies when the employee acts within the scope of its employment." *Friday v. Magnifique Parfumes and Cosmetics, Inc.*, No. 3:17-cv-280 JD, 2017 WL 6048887, at *2 (N.D. Ind. Dec. 7, 2017) (citing *Sedam v. 2JR Pizza Enters., LLC*, 84 N.E.3d 1174, 1178 (Ind. 2017); *Hanson v. Bd. of Trs. Of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 612 n.2 (7th Cir. 2008)).

Here, the Englert Defendants argue that they cannot be liable under either a negligent supervision or *respondeat superior* theory based on Stites' actions because Stites was an independent contractor rather than an employee of Englert or Englert Forensics. (Filing No. 158

at 33.)  Stites also admits that he worked in an independent contractor capacity for Englert Forensics.  (Filing No. 159-2 at 24.)  However, even if Stites were an employee of Englert or Englert Forensics, there is no evidence indicating that Stites committed any underlying tort or other misconduct that could render the Englert Defendants liable to Camm under a negligent supervision or *respondeat superior* theory, as discussed above.  *See Ali v. Alliance Home Health Care, LLC*, 53 N.E.3d 420, 434 (Ind. Ct. App. 2016) ("By definition, *respondeat superior* requires that there be an underlying tort in the first place."); *see also, Sedam*, 84 N.E.3d at 1179.  Without evidence of an underlying harm or tort caused by Stites, Englert and Englert Forensics are entitled to summary judgment as to Camm's negligent supervision and *respondeat superior* claims.

## IV.  CONCLUSION

For the reasons stated above, the Defendants' Motions for Summary Judgment (Filing No. 148; Filing No. 150; Filing No. 152; Filing No. 154; Filing No. 157; Filing No. 160) are **GRANTED**.  Defendants' Motion in Limine (Filing No. 211) is **DENIED as MOOT**.  It is the Court's understanding that Defendant Myron Wilkerson died in 2012, two years before Camm initiated this action.  Because Camm failed to effectuate proper service on Defendant Myron Wilkerson pursuant to Federal Rule of Civil Procedure 4, the Court also **DISMISSES with prejudice** Camm's claims as they relate to Defendant Myron Wilkerson.  Moreover, because Camm failed to identify the Unknown John and Jane Doe Officers and the Unknown Richard and Roberta Roe Supervisors, or to demonstrate that they were properly served with process before the close of discovery, the Court also **DISMISSES with prejudice** the Unknown John and Jane Doe Officers and the Unknown Richard and Roberta Roe Supervisors.  *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007).  Judgment will be entered accordingly.

**SO ORDERED**.

Date: 1/29/2018

_(signature)_

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Garry R. Adams
CLAY DANIEL WALTON & ADAMS PLC
garry@justiceky.com

David A. Arthur
OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Theodore J. Blanford
HUME SMITH GEDDES GREEN & SIMMONS
tblanford@humesmith.com

Daniel J. Canon
CLAY DANIEL WALTON & ADAMS
dan@justiceky.com

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Bryan Findley
INDIANA ATTORNEY GENERAL
bryan.findley@atg.in.gov

Mario Garcia
BRATTAIN MINNIX GARCIA
mario@bmgindy.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

Terry Wayne Tolliver
BRATTAIN MINNIX GARCIA
terry@brattainminnix.com